No. 45,408

Wayne C. Carroll, *Appellant*, v. C. Frederick Kittle, M. D., W. Ashcraft, K. O'Fallon, and Henry A. Bubb, Arthur H. Cromb, C. N. Cushing, John F. Eberhardt, Ray Evans, Clement H. Hall, Dwight D. Klinger, Larry Morgan, Eldon Sloan and Max Bickford, Members of the Board of Regents of the State of Kansas, *Appellees*.

(457 P. 2d 21)

Opinion filed July 17, 1969.

*John E. Shamberg,* of Kansas City, argued the cause, and *Charles S. Schnider, Jacob F. May, Jr.,* and *Gerald T. Elliott,* all of Kansas City, and *Eugene L. Smith* and *Harold K. Greenleaf,* both of Liberal, were with him on the brief for the appellant.

*J. Richard Foth,* Assistant Attorney General, argued the cause, and *Kent Frizzell,* Attorney General, and *Paul E. Artzer,* Assistant Attorney General, were with him on the brief for the appellees.

The opinion of the court was delivered by

HATCHER, C.: This is an action against the members of the Board of Regents of the State of Kansas, and others not involved in this appeal, for damages for personal injuries sustained by plaintiff while hospitalized at the University of Kansas Medical Center.

As the petition was dismissed as to the members of the State Board of Regents, on their motion, for failure to state a claim on which relief could be granted, the facts must be gleaned from the allegations of the petition and the plaintiff's deposition of John Howard Feldman, assistant to the provost, the administrative officer of the Medical Center.

Plaintiff, a 51 year old oil field worker of Great Bend, Kansas, caught his left arm in a drilling rig on November 19, 1964, severely

injuring it. He was rushed to the University of Kansas Medical Center where a team of doctors replanted the partially severed arm which remained viable and the plaintiff's recovery was progressing satisfactorily post operatively.

In the early morning of November 27, 1964, the eighth day after surgery, plaintiff was still hospitalized. Due to the effects of the medicine, drugs or other treatment given plaintiff and as a result of a changed mental condition caused by the effects of his injury and the natural effects resulting therefrom, appellant was rendered confused, mentally disoriented and out of contact with his surroundings. While in this confused state he ripped off the heavy bandages and splints from the injured arm. The night resident surgeon on duty rewrapped the arm and replaced the splints.

The above incident was known to the defendants since it was officially recorded and noted in the hospital record chart of plaintiff. Nevertheless, the defendants took no action or precaution and did nothing to place a watch over the plaintiff to protect him, or prevent him from reinjuring himself. Approximately 48 hours later at 12:45 a. m. on November 29, 1964, the patient was discovered sitting on the edge of his bed having again ripped off all of the bandages and this time tearing open the repaired arm causing the wound to be reopened. The damage done was so extensive that the arm had to be amputated.

It is alleged that the self-inflicted injury resulting in the loss of plaintiff's arm was directly and proximately caused by the negligence and carelessness of the defendants, their agents, servants and employees who joined and concurred to cause his injuries.

Plaintiff was a private patient occupying a single room and paying the full rate—$22.00 per day in 1964. His employer's insurance carrier, Royal Globe Insurance Company, paid the University of Kansas Medical Center $1,567.25 for his hospitalization for the period. This did not include the doctors' bills.

The University of Kansas Medical Center is a general hospital offering a highly and specially trained service to the public, including private, semi-private, charity and semi-charity patients. The defendant Kittle, plaintiff's doctor, was not only a staff physician at the University of Kansas Medical Center but conducted a private practice there treating private patients. All of the hospital facilities, personnel, nurses, residents, interns, medical students and other staff personnel were made available to Dr. Kittle in performing his

duties as a private practitioner and as a staff member of the Medical Center in the care and treatment of his private patients.

At all times mentioned the defendant Kittle was acting as the agent, servant and employee of the University of Kansas Medical Center within the scope of his authority, and he, with the aid of his assistants, was in charge of the care of plaintiff and handled the treatment for the repair of his injured arm.

Pursuant to a resolution passed by the Board of Regents on November 9, 1956, a method was set up for compensating the staff doctors, including plaintiff's doctor, which permitted them to engage in the private practice of medicine at the University of Kansas Medical Center. The plan provided that the fees from the private practice of medicine would be collected by the individual doctor. He would remit seven percent of his fees over $2,500.00 to the Medical Center for general budget use and, in addition, he would make a "voluntary contribution" of eleven percent to a department development fund.

On April 27, 1961, the method of compensating the clinical faculty members was amended slightly but the amendment is not material here.

John Feldman, controller and assistant to the administrative head of the Medical Center was deposed by plaintiff. He testified in substance:

The sums paid by the doctors to the Medical Center, as provided in the Board of Regents' minutes, represented compensation to the University for the use of space and certain personnel. Certain hospital personnel would perform secretarial, clinical and clerical work for the doctors both in their capacity as teachers and in connection with their activities as private practitioners. For the most part, the salaries of these clerical personnel were paid by the state.

As of June 20, 1965, the close of the fiscal year which included the period during which plaintiff was at the Medical Center, the balance sheet of the Medical Center reflects that the plant facilities represented an investment of $30,706,732.90. During the fiscal year ending June 30, 1965, care and hospitalization of patients accounted for income of $5,444,733.30 and other services produced $528,228.02, for a total revenue from sources other than appropriations, grants and gifts of approximately $6,000,000.00. In addition, by making the hospital and its facilities available to the doctors for private patients, services of 97 doctor professors were obtained for the

nominal sum of $3,600.00 per year. This figure does not include interns or resident physicians.

In 1964, the Medical Center admitted 18,674 patients. Of this number 9,700 were private paying patients.

Count one of the petition was based on negligence. Count two of the petition was in the nature of an action on an implied contract.

As previously indicated, the members of the Board of Regents filed a motion to dismiss stating as their grounds that the court lacked jurisdiction of the subject matter and of the persons, and that the petition fails to state a claim on which relief could be granted against the defendants, the members of the Board of Regents. The motion stated:

"In support of this motion defendants show that the immunity of the State Board of Regents was established in *McCoy v. Board of Regents*, 196 Kan. 506 (1966). Such immunity extends also to an action on an implied contract as alleged in Count II of the petition under *Miller v. Kansas Turnpike Authority*, 193 Kan. 18 (1964)."

The trial court sustained the motion. The plaintiff has appealed.

The only issue presented by the parties in their briefs and arguments is whether the doctrine of sovereign immunity is applicable.

The appellant states his position as follows:

"We wish to make it clear at the outset that appellant asks the Court to do only one thing and that is to declare that the State of Kansas and its agencies shall be held liable for the torts committed by its employees and agents in the operation of government business or commercial enterprises in the same manner that it has held cities responsible in this sphere of activity. We are not asking the Court to remove the immunity of government officials for acts within the scope of their authority or for the consequences of their acts flowing from the performance of their duties imposed by law. For the concept of immunity from suit in the performance of the officials' duties inherent in the operation of government springs from an entirely different source than does the rule of immunity from liability of the government for the negligence of its employees."

The appellant is fully cognizant of our former cases, but maintains those cases were wrongfully decided in the first instance, have no logical support in reason and should be overruled.

Perhaps we should first give some attention to the basic theory of sovereign immunity and its application to the present controversy. We do not propose to make the common error of attempting to write a treatise on the troublesome problem of sovereign immunity but we should delve into the subject far enough to disclose the basic philosophy which has governed the thinking of the majority

of the members of the court in deciding the question before us.

We do not subscribe to the theory that sovereign immunity in the United States, and in the individual states, is traceable to the medieval concept that "the king can do no wrong." Our forefathers did not fight the Revolutionary War because they were of that opinion. Their reasoning was quite to the contrary. It is difficult for us to believe that they would carry over into their common law a principle so opposed to their basic belief. (See *Wendler v. City of Great Bend,* 181 Kan. 753, 316 P. 2d 265.)

No doubt the absolute monarchs of the past, and the dictators of today, refused and still refuse to be charged with wrong, but that is no reason why our representative and democratic forms of government should be so classified. We think the rule was adopted in this country as a convenience to a sovereign people. Under our form of government the legal sovereignty is in the people, and the people, in the exercise of their governmental power, through the states, did not wish to be sued and harassed in carrying out their governmental functions. We, therefore, depart from the term "sovereign immunity." We prefer and will use the more applicable term "governmental immunity."

We have refrained from voluminous citations and quotations of authorities from other states. It will suffice to say that in the avalanche of authorities cases can be found supporting absolute immunity, absolute abrogation of immunity and all possible degrees of restrictions between the absolutes. The cases may be found compiled in most any legal treatise on sovereign or governmental immunity, and there are many.

We must go back 200 years to determine what the term "governmental" encompassed when it was first introduced into our law, or 100 years when the Kansas law was being molded. At those times the states and their governmental agencies devoted their energies to governing. Now government engages in many things that are not governmental. At the time the rule of governmental immunity was adopted the courts could not have come close to imagining all of the proprietary functions in which the government and its agencies are now engaged. However, the courts failed, at least we did in this state, to draw a line of demarcation limiting governmental immunity to governmental functions.

The appellees argue that the decision to abrogate the doctrine of governmental immunity is that of the legislature. We recognize

that our previous opinions have stated exactly that. (*McCoy v. Board of Regents*, 196 Kan. 506, 413 P. 2d 73.) However, we have not been consistent in applying the rule to governmental agencies. Note what we said in *Wendler v. City of Great Bend*, supra, at page 759:

"Regardless of the origin and development of the principle of governmental immunity, it is clear that our courts have almost from the beginning denied tort immunity to municipal governments performing 'proprietary' or 'permissive' functions. [Citations omitted.]

"The State is usually deemed immune regardless of the kind of function it is performing. *What justifies the difference between the State and its municipal subdivisions is baffling. The decisions seem to result from accident rather than from reason,* and tend to make one question the entire rationale of the principle. . . ." (Emphasis supplied.)

We have held that a county is not liable for damages for negligence in any capacity unless such liability is expressly imposed by statute or necessarily implied therefrom. (*Caywood v. Board of County Commissioners*, 194 Kan. 419, 399 P. 2d 561.) We have held that a city is liable for its negligent acts when acting in a proprietary capacity, particularly in hospital cases. (*Stolp v. City of Arkansas City*, 180 Kan. 197, 303 P. 2d 123.)

Both counties and municipalities are agencies of the state for governmental purposes. (*Harling v. Wyandotte County*, 110 Kan. 542, 204 Pac. 763; *State v. Lawrence*, 79 Kan. 234, 100 Pac. 485.) The Board of Regents is also a governmental agency created by the legislature. (*Murray v. State Board of Regents*, 194 Kan. 686, 401 P. 2d 898.) It is difficult for the majority of the court to see why one governmental agency performing precisely the same acts—*e. g.,* operating a hospital for profit—should be liable for negligence and others should not.

The majority of the court are of the opinion that the responsibility of the various governmental agencies should be equalized by the elimination of all governmental immunity from negligence when the state or its agencies are engaged in a private or proprietary function.

The governmental immunity doctrine has judicial origin in this state. Our constitution does not touch on the subject and the legislature adopted no general rules but rather left the matter to the courts for a determination of policy. While the legislature has touched upon isolated features of immunity, which has been stressed in previous decisions, it has never considered the general policy to be applied even in the face of our great economic and social

changes. We do not have a comprehensive legislative enactment designed to cover the field. What is before us is a series of sporadic statutes, operating on a separate area of governmental immunity. Appellees would have us say that because the legislature has removed governmental immunity in these areas we are powerless to remove it in others. We read the statutes as meaning only what they say: that in the areas indicated there shall be no governmental immunity. They leave to the court whether it should adhere to its own rule of immunity in other areas. We have suggested to the legislature in practically every opinion written on the subject that the extent to which the doctrine is to be applied is within their province, but the application of the doctrine has largely been left to the discretion of the courts.

After careful consideration a majority of the court is now of the opinion that it is appropriate for this court to abolish governmental immunity for negligence, when the state or its governmental agencies are engaged in proprietary activities, in the absence of the legislature's failure to adopt corrective measures.

However, in abolishing governmental immunity to the extent suggested, we want it clearly understood that we recognize the authority of the legislature to control the entire field including that part covered by this opinion. We would suggest that the legislature is in a much better position than this court to restrict the application of the doctrine because it can supplement the restriction with proper legislation in the form of provisions for insurance, etc., as stated in 61 Columbia Law Review, Judicial Lawmaking, p. 839:

"There is however, a limitation of judicial law making inherent in the nature of the judicial function. Courts can and indeed are called upon to adjust rights and liabilities in accordance with changing canons of public policy. But because they develop the law on a case-by-case basis they can not as can the legislature, undertake the establishment of a new legal institution, 'an elaborate procedure of investigation and consideration eventuating in the approval of a particular form of words as law.'"

It is suggested that we are violating the rule of *stare decisis*. We are insofar as we are eliminating discrimination between certain governmental agencies. Although we have great respect for the rule and recognize its desirability from the standpoint of certainty and stability, it does not follow that we are required to perpetuate a doctrine that is no longer applicable because of changes in economic and social conditions. The rule should not be followed to such an extent that errors be perpetuated or grievous wrongs result. We

are of the opinion that when the reason for a rule no longer exists, the rule itself should be abandoned. We had a somewhat comparable problem in *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934, when this court removed immunity for torts from charitable institutions. It was held:

"Fact that court may have at an early date in response to what appeared good as a matter of policy created immunity from wrongdoing is not a sound reason for continuing rule when under all legal theories rule is basically unsound, especially when reasons upon which rule was built no longer exist.

"When the reason for the existence of a declared public policy no longer obtains, courts should without hesitation declare that such public policy no longer exists." (Syl. 5 and 6.)

The immediate issue before the court is the removal of governmental immunity for tort from the hospital at the University of Kansas Medical Center. This abrogation of immunity, however, raises numerous questions as to the breadth of our determination.

We would simply state in the way of clarification that abrogation of the doctrine applies to all governmental bodies of the state when engaged in private or proprietary activities as distinguished from governmental functions.

We now come to the most troublesome problem of what constitutes a proprietary function. We are mindful of what was said in 60 A. L. R. 2d at page 1204:

"The general tests provided by the courts for determining whether a particular municipal [governmental] function may be regarded as governmental or proprietary have not proved adequate for the resolution of particular questions; and as a result the courts have frequently treated such questions on their individual merits, often reaching at least superficially conflicting results."

It should be stated as elementary that each case must be governed by its own particular facts. However, we may reach a rather broad understanding to which a particular set of facts may be applied. It may be said that when a state by itself, or through its corporate creations, embarks on an enterprise which is commercial in character or which is usually carried on by private individuals or private companies, it is engaged in a proprietary enterprise (*Stadler v. Curtis Gas, Inc.,* 182 Neb. 6, 151 N. W. 2d 915).

We have also laid down a rule for determining whether in operating a hospital, cities or towns are engaged in proprietary or governmental functions. In *Stolp v. City of Arkansas City,* 180 Kan. 197, 303 P. 2d 123, it is stated:

"It is also included in the general rule covering the dual capacity of cities and towns that when there is an activity or function in a private or proprietary capacity for the special or immediate profit, benefit, or advantage of the city or town, or the people who compose it, rather than for the public at large, then the city or town is in competition with private enterprise and is accountable for the torts of its employees the same as any other private corporation or individual. . . ." (p. 202.)

We see no reason why the rule applied to city hospitals in the *Stolp* case should not now be given general application.

We have no hesitancy in concluding that in the operation of the hospital at the University Medical Center the Board of Regents was engaged in a proprietary rather than a governmental function. The operation of a hospital is usually carried on by private individuals or private companies; private patients in the University hospital paid rates comparable to those which were charged in private hospitals; the hospital was receiving an annual income of approximately $6,000,000.00 a year from private patients, and obtained 97 doctors for the medical school's faculty at a nominal salary of $3,600.00 a year because of the hospital facilities furnished them for their private patients.

It is not necessary that an actual net profit result. (*Wendler v. City of Great Bend,* supra.)

We are forced to conclude that the rule of governmental immunity from liability for torts committed while engaged in proprietary functions is today without rational basis and hence there is no logical compulsion to extend it because there is a voluntary mingling of governmental and proprietary functions. Reason suggests that a patient who pays for professional services ought to be entitled to the same protection and the same redress for wrongs as if the negligence had occurred in a privately owned and operated hospital. If the government is to enter into businesses ordinarily reserved to the field of private enterprise, it should be held to the same responsibilities and liabilities.

The courts of our sister states are not in accord on the question of the character of a hospital operation. It would serve no useful purpose to review the decisions of other states in this opinion. Those wishing to compare such cases should see 25 A. L. R. 2d 203 and A. L. R. 2d Later Case Service, volume 3, page 757.

*McCoy v. Board of Regents,* 196 Kan. 506, 413 P. 2d 73, and all other cases holding that the state and its agencies are not liable

for tortious acts committed while engaged in a proprietary function, are overruled.

It will be understood that we are not passing on the merits of appellant's case. He may not be able to prove the allegations in his petition but, after the defendant answers, he has the right to try. The Board of Regents is not an insurer of the safety of patients in the hospital. It is responsible only for hazards reasonably to be foreseen and only for risks reasonably to be perceived. Neither is it responsible for an honest error of professional judgment made by qualified and competent doctors employed by them at the hospital.

It will also be understood that we are not criticizing the Board of Regents for maintaining and operating the hospital. It is no doubt of great academic and financial benefit to the medical school. We are only holding that if it operates the hospital, receiving paying patients, it should be held to the same responsibility and liabilities as privately owned hospitals.

There remains the consideration of the time when the abrogation of the immunity as herein stated shall take effect. We are of the opinion that reasonable time should be given the various public bodies to meet the new liabilities implicit in this decision. We find ample authority for the proposition that in departing from the rule of *stare decisis*, the court may restrict application of a newly established rule to the instant case, and cases arising in the future, where it is clear that the retrospective application of the new rule will result in a hardship to those who have relied upon prior decisions of the court. (See *Molitor v. Kaneland Com. Unit Dist.*, 18 Ill. 2d 11, 163 N. E. 2d 89; *Holytz v. City of Milwaukee*, 17 Wis. (2d) 26, 115 N. W. 2d 618, and cases cited therein.)

Except for the instant case, the effective date of the abolition of the rule of governmental immunity as applied to proprietary enterprises shall be August 30, 1969. Except for the instant case the new rule shall not apply to torts occurring prior to August 30, 1969. In applying the new rule to the instant case we are impressed with what was said in *Molitor v. Kaneland Com. Unit Dist.*, supra. We quote:

". . . At least two compelling reasons exist for applying the new rule to the instant case while otherwise limiting its application to cases arising in the future. First, if we were to merely announce the new rule without applying it here, such announcement would amount to mere *dictum*. Second, and more important, to refuse to apply the new rule here would deprive appellant of any benefit from his effort and expense in challenging the old rule which we now

declare erroneous. Thus there would be no incentive to appeal the upholding of precedent since appellant could not in any event benefit from a reversal invalidating it.

"It is within our inherent power as the highest court of this State to give a decision prospective or retrospective application without offending constitutional principles. *Great Northern Railway Co. v. Sunburst Oil & Refining Co.,* 287 U. S. 358, 77 L. ed. 360." (p. 28.)

The judgment is reversed.

APPROVED BY THE COURT.

PRICE, C. J., dissenting: This decision is another example of the wave of "judicial activism" that has been sweeping this country in recent years.

In 1966—in a like action—a unanimous court held in *McCoy v. Board of Regents,* 196 Kan. 506, 413 P. 2d 73, that the rule applying governmental-proprietary distinction to the functions of municipalities in determining liability for negligence is irrelevant to the functions of a state agency; that the board of regents, as an agency of the state, is not liable for negligence unless such liabilty is imposed by statute, and that the power to impose such liability rests with the legislature and not this court. That decision, and all others of like holding—are today swept aside and thrown to the winds.

I do not propose to debate the "pros and cons" of the doctrine of governmental immunity—as applied to this or other situations. My point simply is this:

The doctrine—for good or for bad—has been recognized and applied since statehood. As such, it has become so deeply imbedded as to be the "public policy" of this state. If the public policy of this state is to be changed I think that it should be accomplished by the people of this state acting through their duly elected legislature— and not by this court. The power of this court is enormous, but about the only check upon the exercise of that power is our own sense of self-restraint.

And neither do I propose to rehash the doctrine of *stare decisis.* I still believe, however, that lawyers should be able to advise their clients and that trial courts should be able to decide cases—in reliance upon settled decisions of this court rather than being compelled to speculate whether what was held yesterday will be the law tomorrow.

I therefore respectfully dissent.

The judgment should be affirmed.

KAUL, and FROMME, J. J., join in the foregoing dissent.

FROMME, J., dissenting: The majority have decided to venture boldly into that legislative thicket of governmental-proprietary functions of state and counties. As a result the many activities of government giving rise to possible tort liability must be examined and determined governmental or proprietary on a case by case basis in the future.

In our recent opinion in *Parker v. City of Hutchinson,* 196 Kan. 148, 410 P. 2d 347, an action was brought against a city for tortious acts of its agents in the operation of the city jail. Liability against the city was denied. In arriving at this holding the court said:

"The response of the legislatures in the states referred to above, as well as in other states where the courts have eroded or eliminated the immunity doctrine, leads us to believe that legislative action is preferable if municipal immunity is to be restricted or abolished." (p. 153.)

In *McCoy v. Board of Regents,* 196 Kan. 506, 413 P. 2d 73, which is being overruled, a patient in the University of Kansas Medical Center brought an action against the Board of Regents of the State of Kansas for injuries sustained while a patient. We denied recovery and held the operation of the medical center was a governmental function. In *McCoy* we said:

"The legislative-judicial prerogative proposition in Kansas may be distinguished from that existing in most states where judicial prerogative has been exercised. In Kansas, as we pointed out in the *Parker* case, the legislature has not been indifferent. We must acknowledge the legislature's awareness of the sovereign immunity principle as evidenced by legislative action in providing in a number of instances for tort liability of political subdivisions and agencies of the state." (p. 510.)

The prerogative of the legislature expressed in *McCoy* is declared in the present case to be a prerogative of this court as well as the legislature.

The difficulties which this court will encounter in determining whether the activity of government giving rise to possible tort liability is governmental or proprietary are myriad. In *Grover v. City of Manhattan,* 198 Kan. 307, 424 P. 2d 256, a ten year old boy was attacked by a coyote which had escaped from a city zoo. It was determined the operation of the zoo was a governmental function.

The city was entitled to governmental immunity absent a statute expressly imposing liability. It is apparent on reading the Grover case no clear test can be devised to differentiate between governmental and proprietary functions. The determination will have to be made by this court on a case by case basis. The uncertainty attendant will stretch many years into the future.

The majority opinion sweeps with a broad broom when it overrules *McCoy* and the other cases which have remained the law of this state for many years. When such a sweeping change in the law occurs abruptly and without warning the reasons for the change should be clearly stated in the opinion. What reasons of public policy suddenly dictate this change by judicial decree? The answer is not apparent in reading the majority opinion.

A new field of litigation is opened with far reaching consequences. This court should not undertake to change the law of this state in this area without devoting more time to the study and evaluation of attendant consequences.

Therefore, I join with the other members of the court dissenting.

PRICE, C. J., and KAUL, J., join in the foregoing dissent.