320 So.2d 68

**Cecil D. JACKSON**

**v.**

**The CITY OF FLORENCE, a Municipal Corporation, et al.**

**SC 934.**

Supreme Court of Alabama.

July 10, 1975.

Rehearing Denied Oct. 2, 1975.

C. A. Poellnitz, Florence, for appellant.

Arnold Teks, Florence, for appellees.

Drayton N. Hamilton, Montgomery, for Alabama League of Municipalities, amicus curiae.

SHORES, Justice.

This is an appeal from a judgment of nonsuit occasioned by the trial court's sustaining the defendant city's demurrer and motion to dismiss the plaintiff's complaint. The trial court specified the grounds upon which the demurrer was sustained, saying:

"... The court is of the opinion that the demurrer is due to be sustained under the doctrine of municipal immunity from liability for injuries inflicted by an agent of the municipality acting in a governmental capacity which is well established by the opinions of the Supreme Court of Alabama ..."

The complaint claimed damages against the City of Florence and a police officer for personal injuries sustained by the plaintiff as a proximate result of the negligence and wantonness of the police officer acting in the line of duty. It was alleged that the police officer, while engaged as a police officer of the City of Florence, negligently assaulted (Count I) and willfully or wantonly assaulted (Count II) the plaintiff, an unarmed, seventy-five-year-old, 130-pound man by the use of excessive force, resulting in the plaintiff's loss of his right eye. In his claim, filed pursuant to Title 37, §§ 476 and 504, Code, the plaintiff asserted:

"On August 1, 1972, I was arrested at The Shanty Restaurant on South Court

Street in Florence, Alabama, by Florence City Police Officers, Grady Smith and Lee Short, at approximately 6:55, p. m. The named officers took me to the police station at the City Hall in Florence, Alabama, where I was escorted into a small room by the two named officers. Then and there City police officer, Grady Smith, struck me in the face on or near my right eye, rendering me momentarily unconscious, and inflicting serious injuries to my right eye and face. I was neither permitted to seek medical attention by said officers for said injuries nor was any attempt made by said officers to get medical attention for me. Immediately following the said assault on me, I was taken by these officers upstairs in the said City Hall and put in a jail cell and kept there until the following morning, viz., August 2, 1972.

"While in the jail cell and during the night of August 1, 1972, and the morning of August 2, 1972, I repeatedly requested to be taken to a doctor to get medical attention for my eye. Notwithstanding my repeated requests, I was not taken to a doctor until around 7:30 on the morning of August 2, 1972, at which time I was driven by City police officers to the Eliza Coffee Memorial Hospital in Florence, Alabama, and carried to the emergency room. Dr. Shaler Roberts of the Florence Clinic was called in to examine my eye and found that it was damages to such an extent that the eye had to be immediately removed."

Appellant acknowledges, as indeed he must, that this is a "head-on" request for a re-examination and reconsideration of the broad question of whether Alabama municipal corporations should continue to enjoy immunity from liability for the wrongful acts of their agents acting within the line and scope of their employment. More specifically, he seeks a re-evaluation of this court's construction of Title 37, § 502, Code. He further admits that, for him to prevail, this court must overrule a long line of cases including, but not limited to,

*Chaffin v. City of Montgomery,* 273 Ala. 492, 142 So.2d 267 (1962); *McSheridan v. City of Talladega,* 243 Ala. 162, 8 So.2d 831 (1942); and *McCarter v. City of Florence,* 216 Ala. 72, 112 So. 335 (1927).

It is generally agreed that the doctrine of sovereign immunity developed in this country from the English doctrine, which grew out of the concept that the "King can do no wrong." That this occurred in America, given the historical background which led to the Revolutionary War, is "one of the mysteries of legal evolution." Borchard, Government Responsibility in Tort, 34 Yale L.J. 1, 4 (1924). The concept of municipal immunity from tort claims had its beginning in the English case of *Russell v. Men of Devon,* 100 Eng.Rep. 359 (1788), which, it has been noted, was 12 years after the Declaration of Independence. Massachusetts is said to be the first state in the United States to adopt the doctrine by judicial decision in *Mower v. Inhabitants of Leicester,* 9 Mass. 247 (1812).

Alabama first considered the question of tort liability of municipalities in 1854, in *Smoot v. The Mayor, etc. of Wetumpka,* 24 Ala. 112. Four years later, it declared cities immune to suit for torts committed by agents in the exercise of a governmental function. *Dargan v. Mayor, etc. of Mobile,* 31 Ala. 469, 70 Am.Dec. 505 (1858). There followed a long line of cases holding that municipalities were liable for torts committed in the exercise of their corporate or proprietary capacity, but were immune from suit for the commission of torts in their governmental capacity.

During this same period, this court made a distinction in connection with streets. In *Smoot v. The Mayor, etc. of Wetumpka,* supra, in holding that the cities were liable for negligent injuries arising out of defects in the streets, the court fixed liability on the theory that there was a breach of an affirmative duty on the part of the city to keep the streets in good repair. The street cases did not rest on the distinction between governmental or proprietary func-

tions, as did other torts. *Albrittin v. Mayor & Aldermen of Huntsville,* 60 Ala. 486, 31 Am.Rep. 46 (1877); *City of Selma v. Perkins,* 68 Ala. 145 (1880); *City Council of Montgomery v. Wright,* 72 Ala. 411, 47 Am.Rep. 422 (1882); *Bradford v. Mayor & City Council of Anniston,* 92 Ala. 349, 8 So. 683 (1890); *Mayor & Aldermen of Birmingham v. Lewis,* 92 Ala. 352, 9 So. 243 (1890); *Mayor & Aldermen of Birmingham v. Starr,* 112 Ala. 98, 20 So. 424 (1895); *Lord v. City of Mobile,* 113 Ala. 360, 21 So. 366 (1896); *City Council of Montgomery v. Reese,* 146 Ala. 410, 40 So. 760 (1906); and *City of Anniston v. Ivey,* 151 Ala. 392, 44 So. 48 (1907).

The doctrine of governmental immunity in this country has been universally condemned in an unending number of published statements by legal scholars and jurists. It is frequently stated that the doctrine cannot be defended on any logical basis. By the turn of the century, it was being criticized as unjust and irrational from many sources; but, there is no doubt that the doctrine was, by that time, firmly established in Alabama law by decisions of this court, as it was in a majority, if not all, of the other states of the Union.

Against this background, the Alabama Legislature acted in 1907, by enacting legislation which is now carried as Title 37, §§ 502–504, which provide:

§ 502. No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless said injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employe[e] of the municipality engaged in work therefor; and while acting in the line of his duty, or unless the said injury or wrong was done or suffered through the neglect, carelessness, or failure to remedy some defect in the streets, alleys, public ways, or buildings after the same had been called to the attention of the council, or after the same had existed for such unreasonable length of time as to raise a presumption of knowledge of such defect on the part of the council, and whenever the city or town shall be made liable to an action for damages, by reason of the unauthorized or wrongful acts, or the negligence, carelessness, or unskillfulness of any person or corporation, then such person or corporation shall be liable to an action on the same account by the party so injured.

§ 503. The injured party, if he sues the municipality for damages suffered by him, shall also join such other person or persons or corporation so liable as defendant or defendants of the suit, and no judgment shall be rendered against the city or town, unless judgment is rendered against such other person or corporation so liable for such injury, except where a summons is returned not found as to a defendant or when judgment is rendered in his favor on some personal defense, and if an action be brought against the city or town alone and it is made to appear that any person or corporation ought to be joined as a defendant in the suit according to the provisions in the preceding section, the plaintiff shall be nonsuited, unless he amends by making such party or corporation a defendant if a resident of the state, but no person shall be sued jointly with the city or town who would not be liable separately, irrespective of this provision. When a judgment shall be obtained against a municipality and the other party liable as aforesaid, execution shall issue against the other defendant or defendants in the ordinary form, and shall not be demandable of the city or town unless the other defendants are insolvent, and the same cannot be made out of their property, and the city or town shall pay only so much of the said judgment as cannot be collected out of the other defendants. If the injured party shall, before bringing suit, demand of the mayor of such municipality the name of such other person or persons or cor-

poration as may be liable jointly with the said municipality to such injured party, and if such mayor failed to furnish within ten days from the making of such demand, the name of such person or persons or corporation, so jointly liable, the said injured party shall not be required to join such other person as a party defendant with said municipality in any suit brought to recover damages for such injuries.

"§ 504. No recovery shall be had against any city or town, on a claim for personal injury received, unless a sworn statement be filed with the clerk, by the party injured, or his personal representative, in case of his death, stating substantially the manner in which the unjury was received, and the day and time, and the place where the accident occurred, and the damages claimed."

As noted in an excellent analysis of the case law, both before and after the enactment of § 502 et seq., Copeland and Screws, "Governmental Responsibility for Tort in Alabama," 13 Alabama Law Review 296, 322:

"No mention is made [in the statute] of liability being restricted to corporate functions of the municipality. The first subdivision in plain language declares the city to be liable for 'injury or wrong done or suffered through the neglect, carelessness or unskillfulness' of an agent engaged in work for the municipality and while acting within the line and scope of his employment. On its face, it would appear that the legislature had brought the municipalities down to a par with other bodies corporate. No exceptions are stated in the first subdivision which could curtail governmental responsibility for tort to ministerial functions. Nor was the statute passed against a background of constitutional prohibition of suits against the municipalities. The immunity existing before the 1907 enactment was wholly judicial in its creation and maintenance. . . ."

Most of the cases, delineating between which functions were governmental and which were ministerial, corporate, or proprietary, applied a benefit test, i. e., ". . . whether the act performed is for the common good of all or whether it is for the special benefit or profit of the corporate entity." *City of Bay Minette v. Quinley*, 263 Ala. 188, 190, 82 So.2d 192, 194 (1955). Shortly after the legislature acted, the Court of Appeals had occasion to consider what the impact of the legislation was to be. In *City of Bessemer v. Whaley*, 8 Ala. App. 523, 531, ·62 So. 473, 475 (1913), speaking through Judge Thomas, that court said:

". . . The character of 'work' to which the statute has reference is work of the servants or officers of a municipality while engaged in the performance of manual labor or in discharging ministerial duties therefor in the execution of its private or corporate acts, or in carrying out some public improvements or works entered upon by it, as contradistinguished from service performed by its officers in discharging the governmental duties of the corporation. . . ."

From that point forward, this court has accepted the interpretation placed on the statute, and has continued to distinguish between governmental functions and corporate or proprietary functions, which has had the effect of making the legislative enactment ineffective in so far as changing the law as it had been judicially declared in this state since 1854. The only change effected by the statute was to eliminate the reference to municipal charters as the source of a city's duty to maintain the streets in safe repair. It is an anomaly that, since the act itself made no distinction between governmental and corporate functions but imposed liability in "street" cases, this court was put in the awkward · position, after the enactment of the statute, of having to declare, to remain consistent with its prior holdings, that the duty to repair streets was "intrinsically ministerial," since they have peculiar and local uses,

saying in *City of Bessemer v. Whaley*, 187 Ala. 525, 527, 65 So. 542 (1914):

". . . These implications appear to rest upon the theory that the duty to keep in repair is a corporate rather than a public duty, which is discharged by a governmental agency of the state. The doctrine is apparently anomalous, but it may be explained by reference to the considerations that streets in cities and towns have peculiar and local uses distinct from the highways of the state, and the duty of the municipal authorities in respect to keeping them in repair is intrinsically ministerial. . . ."

It is apparent, therefore, that the only force given to the enactment passed by the 1907 Legislature, in so far as changing the law of municipal immunity, was simply to perpetuate the law as it existed before the enactment.

Since that time, the litigant suing a municipality in tort must attempt to show that the function being performed which resulted in his injury was a corporate or ministerial one. Needless to say, this has resulted in some curious categories. Garbage collecting has been held governmental, *City of Tuscaloosa v. Fitts*, 209 Ala. 635, 96 So. 771 (1923); but sewer disposal is corporate, *Brown v. City of Fairhope*, 265 Ala. 596, 93 So.2d 419 (1957). Repair and maintenance of streets is proprietary or corporate, *City of Birmingham v. Whitworth*, 218 Ala. 603, 119 So. 841 (1929); but operating a street sweeper to keep the streets clean is governmental, *Densmore v. City of Birmingham*, 223 Ala. 210, 135 So. 320 (1931).

In its present state, the only clue to whether a particular function is governmental or corporate must be found in cases expressly declaring that particular function to fall within one or the other category. The incongruities which have resulted from this effort has itself been the subject of frequent comment, both in Alabama and elsewhere. Copeland and Screws, Governmental Responsibility for Tort in Alabama,

supra; Rhyne, Municipal Law, p. 732; Green, Freedom of Litigation (III): Municipal Liability for Torts, 38 Ill.L.Rev. 355; Phillips, "Active Wrongdoing" and the Sovereign Immunity Principle in Municipal Tort Liability, 38 Ore.L.Rev. 122; Davis, Tort Liability of Governmental Units, 40 Minn.L.Rev. 751.

This judicial sleight of hand could have been avoided entirely by giving to the 1907 legislative enactment its clear meaning. Yet, as case after case has come to this court urging it to correct this judicially created barrier to the courthouses of this state, the answer always given in denying that relief is that the relief sought, if to be obtained, must come from the legislature. In making that statement, this court has not recognized that in Alabama, it was this court which closed the courthouse doors in litigation of this kind as early as 1858; and when the legislature opened them in 1970, we closed then again and, in so doing, thwarted the will of the legislature.

The defendant city, in the instant case, argues just that again, i. e., that relief, if any, must come from the legislature, and we do not blame it. There is abundant authority to support the argument. We have supplied it. Yet, we have also said that the question of immunity "is judicial and not legislative in nature" in a case where the legislature sought to declare a function to be governmental. *Williams v. City of Birmingham*, 219 Ala. 19, 121 So. 14 (1929).

No one believes in the validity of the rule of stare decisis and the necessity for stability in the law more than we do. We are equally, if not more so, adamant in our belief in the profound wisdom in the doctrine of separation of powers. Such is critical, in our opinion, to the survival of our system of government. Under that doctrine, no branch of the government may substitute its judgment for any other. Each branch has inherent powers denied the others. The legislature had the power in 1907 to abolish municipal immunity for tort, there being no constitutional barrier

to its action. This court should have bowed to that legislative prerogative rather than take the course it did, which was to treat the thoughtful legislation as no more than a restatement of the law as it then existed by judicial decision.

The rule of governmental immunity for cities, bottomed, as it is, on the English concept that the "King can do no wrong," is the antithesis of the very concepts upon which our government was founded. In fact, recent events have demonstrated dramatically that the "king can do wrong" in America; and when he does, he must pay the penalty for such wrongdoing.

As alluded to earlier, by the turn of the century this judicially created rule of immunity was under severe attack. In fact, England had, by that time, overruled the decision on which the American cases are founded, and municipal immunity for tort is not recognized by the law of England at this time. See Annotation 160 A.L.R. 7.

We, like everyone else, do not have the benefit of any legislative debate on what is now Title 37, § 502 et seq., Code. But, it seems to us that it is not unreasonable to suspect that the legislature was reacting to the ever-accelerating call for the abolition of what was by that time recognized as an unjust rule of law.

As strongly as we believe in the stability of the law, we also recognize that there is merit, if not honor, in admitting prior mistakes and correcting them. The city here argues that the failure of the legislature to act in this area constitutes its approval of the construction placed on its enactments by this court. It is equally arguable, as noted by Justice Currie, concurring specially in *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618, 626 (1962), that ". . . they [the legislature] deferred to the supposed wisdom of the court, or else determined that the court should correct its own mistakes," or as Judge Moremen of the Court of Appeals of Kentucky responded to the same argu-

ment in *Haney v. City of Lexington,* (Ky.), 386 S.W.2d 738, 741 (1964):

". . . It seems to us that an equally reasonable assumption is that the legislature might expect the courts themselves to correct an unjust rule which was judicially created. . . ."

The Supreme Court of New Jersey met the same argument in *McAndrew v. Mularchuk,* 33 N.J. 172, 193, 162 A.2d 820, 832 (1960), and said:

". . . But the limitation on the normal operation of *respondeat superior* was originally placed there by the Judiciary. Surely it cannot be urged successfully that an outmoded, inequitable, and artificial curtailment of a general rule of action created by the judicial branch of the government cannot or should not be removed by its creator. . . ."

And again, by the Supreme Court of Washington, in *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 Wash.2d 162, 178, 260 P.2d 765, 774 (1953):

". . . We closed our courtroom doors without legislative help, and we can likewise open them. . . ."

We earnestly believe that the responsibility for correcting what is universally condemned as a bad rule of law rests with this court. The rule of municipal immunity cannot be rationally defended. We agree with the statement made in *Barker v. City of Santa Fe,* 47 N.M. 85, 88, 136 P.2d 480, 482 (1943):

". . . '. . . It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong", should exempt . . . [municipalities] from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than dis-

tributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.' "

■ In abolishing the doctrine of municipal immunity, Alabama joins a growing number of states in abolishing governmental immunity as to various governmental units: *Stone v. Arizona Highway Com.*, 93 Ariz. 384, 381 P.2d 107 (1963); *Muskopf v. Corning Hospital Dist.*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Hargrove v. Cocoa Beach*, Fla., 96 So.2d 130, 60 A.L.R.2d 1193 (1957); *Molitor v. Kaneland Community Unit Dist.*, 18 Ill.2d 11, 163 N.E.2d 89, 86 A.L.R.2d 469 (1959), cert. den. 362 U.S. 968, 80 S.Ct. 955, 4 L. Ed.2d 900; *Carroll v. Kittle*, 203 Kan. 841, 457 P.2d 21 (1969); *Haney v. Lexington*, supra; *Myers v. Genesee County Auditor*, 375 Mich. 1, 133 N.W.2d 190 (1965); *Williams v. Detroit*, 364 Mich. 231, 111 N.W. 2d 1 (1961); *Brown v. Omaha*, 183 Neb. 430, 160 N.W.2d 805 (1968); *Rice v. Clark County*, 79 Nev. 253, 382 P.2d .605 (1963); *B. W. King, Inc. v. West New York*, 49 N.J. 318, 230 A.2d 133 (1967); *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896 (1970); *Holytz v. Milwaukee*, supra.

We observe, however, in none of the states mentioned above, so far as our research has revealed, was the court acting, as we are, to let the will of the legislature, so long ignored, prevail.

■ In departing from our earlier holdings in this area, a departure which we believe is required to let the legislative will operate, and also by justice, we recognize that the decision would work hardship on municipalities in this state which have re- lied on the earlier cases.

Many states have considered this problem and have applied the new rule in various ways. When Kentucky abolished the rule of governmental immunity, it dealt with the problem of the new rule's applicability and said:

"Three courses are open to us under such a situation as is presented here: (1) We can merely announce the new rule without applying it and suggest that it should be applied to cases brought to us in the future. (2) We can give relief to the appellant in the instant case, but deny it to any others whose injuries occurred before the date of the opinion; or (3) We can apply the rule in the instant case and permit all others who have been injured, not barred by the statute of limitations, to take advantage of the new rule. In the first instance the announcement of the new rule would be merely obiter dictum, which is frowned upon by some authorities. The second alternative gives the appellant a reward for his industry in again suggesting to the Court that it has been wrong. The third category, of course, permits retrospective relief. We see no particular reason why this third application of the rule is harmful. It is difficult to believe a city or any of its agents ever committed a tort deliberately and in reliance upon the doctrine of governmental immunity. We declare the law applicable not only to this case, but to all cases which may have arisen within the proper time of limitation." *Haney v. Lexington*, supra, 386 S.W.2d at 742.

The reasoning of the Kentucky Court has strong appeal. However, it is noted in that opinion, *Haney v. City of Lexington*, supra, that in a prior opinion " . . . this Court gave warning that it was dissatisfied with the rule of municipal immunity." (386 S.W.2d at 742) No opinion by this court has issued such a warning. For that reason, and for another to be expressed momentarily, we believe that the second alternative constitutes a reasonable compromise. Therefore, this holding is applicable to the appellant in the instant case, and to all others suffering injury after the date hereof. There is ample authority for this treatment. Frequently referred to as a quasi-prospective abrogation, it is said to protect not only the governmental agencies

in their probable reliance on the immunity, but also recognizes the efforts of the plaintiff in initiating the action. *Parish v. Pitts*, 244 Ark. 1239, 429 S.W.2d 45 (1968); *Molitor v. Kaneland Community Unit Dist.*, supra; *Becker v. Beaudoin*, supra. There is no constitutional prohibition against such treatment. *Great Northern Ry. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

In deciding, as we do, that municipal immunity for tort is abolished in this state after the date of this opinion, we recognize the authority of the legislature to enter the entire field, and further recognize its superior position to provide with proper legislation any limitations or protections it deems necessary in addition to those already provided in Title 37, §§ 503 and 504, and in Title 37, § 476, Code.

The judgment appealed from is reversed.

Reversed and remanded.

FAULKNER, JONES, ALMON and EMBRY, JJ., concur.

BLOODWORTH, J., concurs in the result.

HEFLIN, C. J., and MERRILL and MADDOX, JJ., dissent.

MERRILL, Justice (dissenting).

I would affirm the judgment of the circuit court and, therefore, I dissent.

The statement the "King can do no wrong" appears three times in the majority opinion, and a casual reader of that opinion might get the idea that that concept is the basis of American and Alabama decisions upholding the doctrine of governmental immunity. That obviously is not the case.

Most of the words in our revered Declaration of Independence, 200 years old in 1976, catalogue *wrongs* of the King, and

those wrongs were the reasons for the support of our long war for independence from England and the rule and wrongs of the King. Then our own government, first under the Articles of Confederation and later the Constitution of the United States made certain that this new country would have no king.

Our doctrine of governmental immunity, both state and national, grew out of the common sense approach that the people had created a democracy under a republican form of government; that the government was the people, and the people's government should not be weakened by allowing the people to sue themselves when the government committed a tortious act while engaged in a governmental function. In McQuillin, Municipal Corporations, Vol. 18, 3rd Ed. Rev., Section 53.24, pp. 167 et seq., a recognized and oft-quoted authority, states:

"In the absence of statute, it has always been the law that no private action for tort will lie against the state, since negligence cannot be imputed to the sovereign. So, in the various localities or local areas where the state agencies merely perform governmental functions of the state and acquire no individual corporate existence, they stand as the state, and, therefore, to hold them responsible for negligence would be the same as holding the sovereign power answerable for its action. It is assumed that no provate legal duty rests upon a city to perform governmental functions, and, moreover, 'their character precludes the idea of the common law rule of responsibility, for there is no standard of reasonable care by which the acts of the government may be tested. The state, through its representatives, namely, the municipal corporation, acts in its sovereign capacity, and does not submit its actions to the judgment of the courts.' 'The reason is that it is inconsistent with the nature of their powers that they should be compelled to respond to individuals in damages for the manner of

their exercise. They are conferred for public purposes, to be exercised in their prescribed limits, at discretion, for the public good; and there can be no appeal from the judgment of the proper municipal authorities to the judgment of courts and juries.'

"The doctrine exempting a municipal corporation from private action for torts resulting from the performance of its governmental functions, steadily adhered to by the most recent judicial decisions, as above indicated, is based on the familiar reason that the undertaking is not to promote the private interests of the municipality as a corporate entity, but rather for the public benefit, and in the performance of such obligation the municipality is a mere public agent, either of the state or of the local community. The reason, as often expressed, it one of public policy, to protect public funds and public property. 'Taxes are raised ·for certain specific governmental purposes; and, if they could be diverted to the payment of the damage claims, the more important work of government, which every municipality must perform regardless of its other relations, would be seriously impaired if not totally destroyed. The reason for the exemption is sound and unobjectionable.' "

In Alabama, the people have tried the doctrine both ways insofar as the State government is concerned. The Constitution of 1819, our first, provided: "The general assembly, shall direct, by law, in what manner, and in what courts, suits may be brought against the State.". Statutes were passed in accordance with this provision. Clay's Dig. 339, §§ 143–146. In the Constitutions of 1865 and 1868, the people said "That suits may be brought against the State, in such manner, and in such courts, as may be by law provided." In *Ex parte State*, 52 Ala. 231 (1875), this court held that since the statutes authorizing suits against the state had been repealed, no such suits could be brought. But in the Constitution of 1875 and our present Constitution of 1901 (§ 14), the people had changed their minds and said, "That the State of Alabama shall never be made a defendant in any court of law or equity." No king or kingly concept had anything to do with those provisions of our Constitution.

Earlier in 1857 in the case of *Dargan v. Mobile*, 31 Ala. 469, where the City of Mobile was sued for a tortious act of a policeman, this court held that the city was "executing a governmental power vested in it for the public benefit" and said:

"Because the corporation is, as to the passage of the ordinances and the appointment of the officer described in the pleadings, a government, exercising political power, it is irresponsible for the official misconduct alleged, upon the same principle which generally protects governments and public officers from liability for the misfeasances and malfeasances of persons necessarily employed under them in the public service. —Story on Agency, §§ 319, 319 a, 319 b, 320, 321; Dunlap's Paley's Agency, 376. Municipal corporations, *quoad hoc,* stand upon the same foundation with public officers, counties, townships, and other *quasi* corporations, charged with some public duty, or invested with some portion of the authority of the government, where the employment of officers is necessary and lawful."

So it can be seen that the common-law rule of governmental immunity was in effect before any provisions were placed in the Constitution.

In 1907, the Legislature passed a new municipal corporations act, a part of which is Tit. 37, §§ 502–504, quoted in the majority opinion. It was the duty and power of the judiciary of this state to interpret those sections. They were interpreted by both this court and the then Court of Appeals as not abrogating the rule of governmental immunity when a municipality was engaged in a governmental function for the benefit of the people. But this court has

recognized the power of the Legislature to diminish that immunity in §§ 502–504. In 1954, this court, in discussing a dedicated street said in *Oliver v. Water Works & Sanitary Sewer Board,* 261 Ala. 234, 73 So.2d 552:

"* * * It requires some distinct act by the city to constitute an acceptance, such as a formal resolution or by acts and conduct of the city authorities recognizing it as a dedicated street. After the city has accepted its dedication there are certain duties and responsibilities imposed by statute upon the city. They result from what is now Title 37 beginning with section 502. Prior to that enactment the upkeep of the streets was a governmental function and not a legal duty, except as otherwise provided by some special law. *Albrittin v. Mayor & Alderman of City of Huntsville,* 60 Ala. 486. Thereafter it has been a legal duty, imposing responsibility upon the city for negligence in performing it. The power and authority to control streets was made the exclusive prerogative of the city, which created a corresponding and coextensive duty and therefor a civil liability for the consequences of a default therein." (Citations omitted.)

In *City of Decatur v. Parham,* 268 Ala. 585, 109 So.2d 692, this court, in replying to the same argument which was made and presented in the instant case, said:

"We have consistently adhered to the principle that legislative action is required to make a municipal corporation responsible for personal injuries or death caused by the negligence of its servants, agents or employees while engaged in governmental functions and we think it unsound to extend the nuisance exception to cover such injuries, thereby requiring the City to defend every personal injury negligence further confused by attempts to force a coverage of the individual case.

"Although, as we have observed, some courts engage in chipping away bit by bit at the doctrine of governmental immunity from one point of view or another where distinctions, defensible or indefensible, are seen, the general doctrine is so firmly embedded in our jurisprudence that we entertain the view that correction, if needed, must come from the legislature. Only the legislature can provide the regulations and limitations necessary to protect the public interest and provide the fiscal basis for payment of such claims."

It is my opinion that the holding in this case will be a heavy blow to law enforcement in Alabama. In practically every arrest or even detention for investigation, there is a physical touching of the suspect by the officer, either in frisking the person or handcuffing him, or both. An allegation and evidence that the officer used more force than was reasonably necessary would make a jury question in every suit against the officer and the municipality that employed him. Not only would the courts soon become clogged with such cases, but many of them would be filed merely as a permissible form of blackmail to force the city to settle for a dismissal or a lighter sentence or to force the officer to change his testimony in many such cases. Many arrests are made in unfriendly surroundings and the officer could easily be outsworn as to what happened. It is not to be expected that too many deputy sheriffs or policemen would physically block entrance to private or public buildings when faced with a large group of demonstrators, rioters or hoodlums when he knew that any act on his part, other than talking, would result in a suit against him and his employer.

Then, there is a tremendous economic impact on the municipalities. This policy decision changes the rule drastically and it will come upon municipalities in Alabama without warning because for over 100 years the appellate courts of this state have applied the doctrine of governmental immunity when the agent or employee was engaged in a governmental function.

There will be consideration of closing "public squares, parks, playgrounds and recreational facilities (all governmental functions, *Jones v. City of Birmingham*, 284 Ala. 276, 224 So.2d 632), reducing other public services and hunting funds to pay additional and higher insurance premiums. It seems to me that some warning could have been given by this court that such a drastic change in the law was imminent. I also fear that the position of the majority probably means the future closing of many city and county Hill-Burton hospitals that are presently barely able to stay open.

This dissent is already too long. I close with some words of Justice Thomas E. Brennan of the Supreme Court of Michigan. These words express my sentiments. The background for the writing follows. In 1961, the Supreme Court of Michigan, in *Williams v. City of Detroit*, 364 Mich. 231, 111 N.W.2d 1, by a 5 to 4 vote (one of the majority only concurred in the result), affirmed a decision which did away with governmental immunity from ordinary torts in Michigan and approved the holding in subsequent cases. On July 1, 1965, the Legislature of Michigan reimposed the doctrine by statute. In *Smith v. Ginther*, 379 Mich. 208 150 N.W.2d 798 (1967), the plaintiff was injured in a collision with a car driven by a volunteer fireman while responding to a fire alarm. The accident occurred after the decision in *Williams* but before the Legislature reinstated governmental immunity. The trial court ruled that the legislative enactment did not control. The vote was 4 to 3 and Brennan, J., dissented. In his dissent, he said in part:

" * * * When judges get into the area of deciding policy they get into trouble. Those who sought unsuccessfully and later successfully to abolish governmental immunity have thought it the wiser policy. The legislature has since vindicated the minority who felt otherwise. If the common-law rule holding the various levels of government immune from civil liability by reason of

the tortious acts of their agents when engaged in governmental functions was indeed an ancient wrong crying out for redress, we must marvel that it has been re-perpetrated by a modern legislature. The truth is that the rule is not a wrong, ancient or recent. It is simply a rule of reason ordained for the common good. In the last analysis, the preservation of civil government is thought to be a greater good, even for the unfortunate plaintiff than compensation of his injuries from the public coffers. In a government whose power to borrow money is constitutionally circumscribed, it is thought to be a prudent policy to deny to civil juries the unfettered power to increase the public indebtedness.

"This is no outmoded theory that *'the King can do no wrong.'* It is merely a recognition that in a government of the people, by the people, and for the people, the wrongs inflicted by government upon the people are wrongs they inflict upon themselves. Defendant Ginther was a volunteer fireman on his way to a fire in his own car. Plaintiff can sue Mr. Ginther. Plaintiff can collect from Mr. Ginther, if he was at fault. The people of Croswell didn't injure this plaintiff. Mr. Ginther did. The City merely maintained a volunteer fire department for the protection of the lives and property of persons in its area, including the plaintiff.

"When fire rages, when the dam breaks, when the enemy attacks, the people, through their government must act. They must act vigorously and boldly or they perish. It is not for judges, serene in their robes and far removed by time and space from the common peril, to brand them negligent in their travail and suffer their fortunes and their labors to be further taxed to pay compensatory damages to those who chanced to be injured in the community's efforts to overcome the disaster rather than in the disaster itself."

I would affirm the judgment of the trial court because this being a matter of important state policy, I remain of the opinion that it is a legislative rather than a judicial matter.

MADDOX, J., concurs.