373 So.2d 254 (1979)
Ernest JONES
v.
Kevin KNIGHT et al.
No. 51154.
Supreme Court of Mississippi.
July 11, 1979.
Rehearing Denied August 1, 1979.
*255 Corr, Carlson & Fleming, George C. Carlson, Jr., Sardis, for appellant.
A.F. Summer, Atty. Gen. by Donald Clark, Jr., Sp. Asst. Atty. Gen., Jackson, for appellees.
En Banc:
BROOM, Justice, for the Court:
Sovereign immunity is the chief issue of this case appealed from the Circuit Court of the Second Judicial District of Yalobusha County, which court sustained the defendants' demurrer. Defendants (appellees) are Kevin Knight, individually and in his official capacity as a Mississippi Park Commission ranger, the Mississippi Park Commission, its director, and its members in their individual and official capacities.
According to Jones' declaration on June 20, 1976, the defendant, Kevin Knight, while performing his duties as ranger for the commission on state park grounds, unlawfully assaulted and battered the plaintiff, appellant Jones. Each defendant demurred. From the order of the lower court sustaining the demurrer, Jones appeals, urging that the doctrine of sovereign or governmental immunity is archaic and antiquated, and should now be abrogated by this Court.
The gist of the allegations contained in the declaration is that appellant Jones was assaulted, et cetera, when he went upon the Mississippi State Park grounds at Enid Reservoir, intending to locate and reserve a place for himself and others to have a picnic. Other allegations are: Knight, as agent, servant and employee of the park commission, directed verbal abuse and nasty language at Jones, and then suddenly and without any cause or provocation or warning, sprayed him with "mace", thereby injuring him. Paragraph 7 of the declaration charges:
The aforesaid willful, malicious, intentional, unprovoked and unlawful assault and battery upon the person of Plaintiff *256 proximately caused or contributed to the injuries and damages suffered by Plaintiff; therefore, Plaintiff now charges Defendant, Kevin Knight, individually, and in his official capacity as a Mississippi Park Commission Ranger, with the following specific unlawful acts or omissions:
(a) Committing a willful, malicious, intentional, unprovoked and unlawful assault and battery upon the person of Plaintiff;
(b) Spraying, unlawfully and unnecessarily, a riot control substance known as "mace", in the face of Plaintiff, at point blank range;
(c) Leaving Plaintiff completely incapacitated after committing the actions described in (a) and (b) thereby causing Plaintiff to suffer further damages and injuries.
Also, Paragraph 10 of the declaration states, in part, as follows:
Plaintiff now charges that the aforesaid willful, malicious, intentional, unprovoked and unlawful assault and battery upon his person, by Defendant, Kevin Knight, individually and in his official capacity as a Mississippi Park Commission Ranger . .. proximately caused or contributed... .
The declaration charged that the other defendants (park officials) employed the ranger-defendant Knight, knowing him to be unqualified, of a violent nature, and without proper training, and it otherwise sought to hold them liable for the acts of the ranger, defendant Knight.
It is undisputed that the Mississippi Park Commission is an agency of the State of Mississippi pursuant to Mississippi Code Annotated § 55-3-31 (1972), et sequitur, and that the commission by statute had vested in it control of the state parks within the state. No statute has been found or cited to the effect that the sovereign immunity of the commission was waived in any manner. In his brief, appellant Jones concedes "that in past decisions of this Court it has been stated that an arm or agency of the state could not be sued except by express statutory or constitutional authority. Smith v. Doehler Metal Furn. Co., 195 Miss. 538, 15 So.2d 421 (1943)." Appellant recognizes Reed v. Evans, 342 So.2d 290 (Miss. 1976), and Berry v. Hinds County, 344 So.2d 146 (Miss. 1977), both of which recent cases upheld the doctrine of governmental immunity. As to all of the defendants except Kevin Knight, the thrust of appellant Jones' argument is that this Court now should abrogate the doctrine, and grant him a trial on the merits as to all of the defendants who were sued because they were members of, or were either agents or director of, the park commission. The lower court obviously thought that the doctrine of sovereign immunity was applicable and, on that basis, sustained the demurrer as to all defendants. We must affirm now (except as to Kevin Knight, the park ranger) unless this Court decides to abrogate the doctrines of immunity of public officials and sovereign immunity and overrule our long line of cases up to and including the 1977 case of Berry v. Hinds County, supra. Our decision in Rev. W.L. Jagnandan v. Mississippi State University, 373 So.2d 252 (Miss. 1979), also upheld sovereign immunity.
Much can be said in favor of abrogating the doctrine of sovereign immunity, but we consider the subject one which should be addressed by the legislature. Abrogation may be accomplished by decision of this Court, but we are not in position to logically decide from what source state funds would be supplied in satisfying a judgment (in the event such be awarded the plaintiff against the Mississippi Park Commission). State agencies are operated within budgetary limits, and legislation is prerequisite to the inherent budgetary problems which a judgment against a state agency would create. We think that before sovereign immunity is struck down, legislative action should be taken to designate funds for payment of judgments. As Justice Robertson wrote in Berry v. Hinds County, supra:
Long ago, we held, in State Highway Commission v. Gully, 167 Miss. 631, 145 So. 351 (1933):

*257 "A general statutory grant of authority to sue a governmental subdivision or agency does not create any liability, and suit may be maintained thereunder only for such liability as is authorized by statute, expressly or by necessary implication. City of Grenada v. Grenada County, 115 Miss. 831, 76 So. 682; Brabham v. Board of Supervisors of Hinds County, 54 Miss. 363, 28 Am.Rep. 352. At the time these cases were decided, the statute provided that any county might sue or be sued by its name, section 3484, Rev.Code 1871, section 309, Code 1906; and it was expressly held in each of these cases that there can be no liability against the state or its political subdivisions or agencies unless it is expressly or impliedly created by statute." 167 Miss. at 647, 145 So. at 354. (Emphasis added).
Of course, the courts, as well as the legislature, have the undoubted right to abrogate the doctrine of governmental immunity. We are of the opinion, however, that the legislature is in a better position to limit and restrict claims that can be asserted and to provide the ways and means for the paying of such claims (either by taxation or appropriation), if it should see fit to do so. Therefore, we decline to abolish the doctrine of governmental immunity at this time by judicial decision.
Abrogation of sovereign immunity strongly appeals to the sentiments of us all, but, if it were done as sought by the appellant, it would leave every state agency, institution, or branch of government vulnerable to tort suits. We think abrogation, if ever accomplished, should be accompanied by legislation alluded to by Justice Robertson in Berry v. Hinds County, supra.
The posture of the defendant-appellee, Kevin Knight, the individual defendant whom appellant Jones charged with assaulting and battering him, differs from the other defendants' posture. Scrutiny of the declaration, insofar as defendant-appellee Kevin Knight is concerned, leads us to conclude that from the declaration it cannot be said with confidence that any immunity doctrine extends to him. Accordingly, appellant Jones should be given an opportunity to put on proof concerning the actions of the appellee, Ranger Knight, on the occasion in question. Then, upon the proof, the lower court should decide whether or not Knight is shielded by the immunity of public officials doctrine, or whether a case is made out sufficient to go to the jury on the issue of the alleged liability of Kevin Knight, individually. Davis v. Little, 362 So.2d 642 (Miss. 1978).
Accordingly, we conclude that the lower court properly sustained the demurrers of all of the defendants-appellees except as to Kevin Knight. As to him, all members of this Court agree that this cause must be reversed and remanded for presentation of proof and trial on the merits. We hold that the doctrine of sovereign immunity applies so as to exonerate the park commission, and that the demurrer was rightly sustained as to all parties defendant except Knight.
AFFIRMED AS TO ALL PARTIES EXCEPT KEVIN KNIGHT;
REVERSED AND REMANDED AS TO KNIGHT.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER and LEE, JJ., concur.
PATTERSON, C.J., and BOWLING, J., dissent.
COFER, J., took no part.
BOWLING, Justice, dissenting:
I dissent from the majority opinion holding that this Court should not abolish the out-of-date principle of governmental immunity. In my humble opinion, it is time for our State to follow the lead of a majority of other states on this question. I certainly do not believe in change just for the sake of changing something. I am not a crusader for change unless it is a change for improvement. I believe, however, that all such questions should be analyzed carefully and that we should not be the last so to do.
*258 For those non-legal persons who might read this governmental immunity is a principle under which state agencies and state political subdivisions are not held responsible for injuries caused by them to others the same as an ordinary person, association, corporation or other private entity.
I hasten to explain and so that it may be fully understood that this does not mean liability on the part of individual members of state or local governmental agencies. It involves only the "sovereign" and not individuals who happen to be members of commissions, boards, etc. With deference, the majority opinion seems to indicate that this would be the case but it would not be that unless the individual was guilty of a wrong in his personal capacity. I certainly agree with the lower court and the majority opinion in this case that it should have been dismissed as to the individual members of the Park Commission. At the risk of being misunderstood, I further state that the abolition of "sovereign" immunity does not refer to so-called "civil rights" cases. Such cases are the result of Federal laws and regulations and the vast majority are handled in Federal courts and would not be affected by abolishing "sovereign" immunity.
The majority opinion states: "We must affirm now (except as to Kevin Knight, the Park Ranger) unless this Court decides to abrogate the doctrines of immunity of public officials and sovereign immunity and overrule our long line of cases[,] ..." With deference, the statement regarding public officials is not accurate. As hereinbefore stated, the individual members of state agencies would not be affected any more than they are at the present time. They now, and still would be, liable for any personal wrong that they did. The abolition of "sovereign immunity" means just what it says, that is, abolishing the immunity of the "state" and its political subdivisions.
The majority opinion further states that abolishing sovereign immunity "would leave every state agency, institution, or branch of government vulnerable to tort suits" and that "[s]tate agencies are operated within budgetary limits, and legislation is prerequisite to the inherent budgetary problems which a judgment against a state agency would create." The answer to this reasoning is that the abolishment of sovereign immunity would not apply to the present case or any wrongs claimed prior to such action. It would be prospective and give state agencies ample opportunity to become fully insured, the same as any company or individual who is in a position to cause harm to the citizens of the state and required by law to have such protection.
Another clear inequity in sovereign immunity is the position of employees of the state. As shown in the majority opinion, the case is reversed for only the employee to defend the suit and pay any judgment. The employer, the state, is relieved not only in regard to the members of the public allegedly wronged, but is relieved from the duty to be properly insured for the protection of its employees as well as the public. The employee is left "holding the bag." Why should a private company be required to protect its employees when the state making the requirement refuses to protect its own employees?
Research reveals that over thirty states completely have abolished governmental immunity. All but a small number have made a partial abolition. It is reasonable to say, considering the recent pronouncements of court opinions, that in the near future governmental immunity probably will be abolished completely in all states.
An example of the injustice caused by governmental immunity is shown by the Mississippi Safety Responsibility Law which requires insurance coverage on all vehicles operated by persons, firms, copartnerships, associations or corporations, but expressly provides that such requirement does not apply "with respect to any motor vehicle owned by the State of Mississippi or any political subdivision of this state." How could justice be served by protecting the ever-increasing users of our highways from the careless driver behind a wheel of a vehicle either privately or corporately *259 owned and providing no protection against the careless driver behind the wheel of a vehicle owned by a state agency or a state political subdivision? Admittedly, in recent years the legislature has passed special acts authorizing certain state agencies and political subdivisions to purchase automobile liability insurance in minimum amounts while expressly forbidding others to do so. I commend the legislature for giving protection, although minimal and inadequate, to the citizens from wrongs done by a certain number of state agencies. This, however, only adds to the confusion. How can it be said that drivers from certain agencies might injure and others would not? How can there be any guidelines for choosing one and not the other?
We have before us, however, a question that goes deeper than the mere authorization of liability insurance on state vehicles. We have before us the situation of an alleged innocent person being severely damaged by an agency protected from any responsibility therefor, whether it be through the operation of a motor vehicle or any other careless, wanton, reckless or wilful act causing injury to the innocent victim.
At the outset, I know some will say that governmental agencies are in reality the people themselves. The fallacy of this argument under modern times is obvious. There is no reason to expect a company, an individual, or any other type of private business to have insurance to cover its exposure because of injury to others and such insurance not being equally available to be purchased by the state agency or a state political subdivision. This is clear under modern insurance business. The extent of any exposure by a particular governmental agency would be considered under the terms of insurance coverage the same as different exposures are considered under all other private businesses. The one basic difference and the principal argument then would be cured and the innocent victim would be protected regardless of who caused his damage. Why should innocent victims be protected under the law of requiring businesses to purchase insurance but not protected from state agencies who could be equally insured?
A brief look at the history of the principle of governmental immunity further advances the fallacy of its continued existence. The doctrine was developed in England many years ago under the concept that "the King can do no wrong." The birth of the doctrine was in the celebrated English case of Russell v. Men of Devon, 2 Term. Tep. 671, 100 Eng.Rpt. 359 (1788). The immunity of the King was extended to an unincorporated county and influenced by the lack of insurability and the absence of county funds, the county was held to be immune from liability for its wrongs the same as the King.
Some twenty-four years after Russell, the first American court, obviously for the same reasons as in Russell and in the absence of modern day insurance coverage, adopted the doctrine of sovereign immunity. This was by the Massachusetts Court in Mower v. Leicester, 9 Mass. 247 (1812).
That the doctrine was adopted in this country after the Revolutionary War, which in part resulted from the "King can do no wrong" concept, seems to have been against what the framers of the Constitution fought for at that time. As stated by the Alabama Supreme Court in Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975):
That this occurred in America, given the historical background which led to the Revolutionary War, is "one of the mysteries of legal evolution."
Before proceeding further, I point out a constitutional provision that evolved from the Convention of 1890 long after the immunity doctrine crossed the Atlantic. Article 3, section 24 of the Mississippi Constitution reads as follows:
All courts shall be open; and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice shall be administered, without sale, denial, or delay.
Article 3, section 14 of the Mississippi Constitution of 1890 provides that,

*260 No person shall be deprived of life, liberty or property except by due process of law.
Amendment 14, section 1 of the United States Constitution provides:
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
This Court has followed the concept of there being a right for every wrong, except in the area of injury by the sovereign state. In Dr. Pepper Bottling Co. of Mississippi v. Bruner, 245 Miss. 276, 148 So.2d 199 (1962), the Court said:
As a general rule, it is the natural inherent duty owed by one person to his fellowmen, in his intercourse with them, to protect life and limb against peril, when it is in his power to reasonably do so. The law imposes upon every person who undertakes the performance of an act  which, it is apparent, if not done carefully, will be dangerous to other persons, or the property of other persons  the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or property which is directly attributable to a breach of such duty.
It is inconceivable to me why the above rule of law would apply to one person, firm, or corporation and not to entities of the state, particularly under modern day principles of being covered by insurance under almost every situation. To say otherwise is to make a legal pronouncement that certain persons who receive a grievous wrong, a serious injury and unlimited damages has a right for that wrong done against some and not against others.
In one of the earlier cases abolishing governmental immunity, the Supreme Court of Florida, in Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957), said:
The immunity theory has been further supported with the idea that it is better for an individual to suffer a grievous wrong than to impose liability on the people vicariously through their government. If there is anything more than a sham to our constitutional guarantee that the courts shall always be open to redress wrongs and to our sense of justice that there shall be a remedy for every wrong committed, then certainly this basis for the rule cannot be supported.
As hereinbefore stated, our legislature has recognized the need for changes in the doctrine of immunity and have abolished it to some degree in a number of special situations. In my opinion, however, this, while being of isolated help in some cases, only serves to confuse the doctrine and its application and serves to confuse the rights of the citizens coming in contact with the entire spectrum of government. The California Supreme Court, in the case of Muskoph v. Corning Hospital Dist., 55 Cal.2d 211, 11 Cal. Rptr. 89, 359 P.2d 457 (1961), said:
The rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia. (Citations omitted). It has been judicially abolished in other jurisdictions....
None of the reasons for its continuance can withstand analysis. No one defends total governmental immunity. In fact, it does not exist. It has become riddled with exceptions both legislative ... and judicial .. ., and the exceptions operate so illogically as to cause serious inequality.
The Supreme Court of New Hampshire, in the recent case of Merrill v. City of Manchester, 114 N.H. 722, 332 A.2d 378 (1974), said:
No one defends total immunity for municipalities. Hence the many exceptions, both legislative and judicial, which result in serious inequalities. Some who are injured can recover, others cannot.
*261 Before going further in this discussion, it is interesting to note that although the doctrine had its roots in England under the immunity of the King, it has been virtually abolished there at all levels of government.
Three of the many states who have had the foresight to protect their citizens on equal basis are our sister states of Louisiana, Alabama, and Florida. The Supreme Court of Louisiana, in the case of Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Co., Inc., et al., 273 So.2d 19 (La. 1973), in abolishing immunity mentioned three basic reasons: (1) That it was manifestly unfair to the injured persons; (2) that it tends toward governmental irresponsibility; and (3) it is an unnecessary exception to the policies of the state as set forth in its constitution. The Court stated:
Governmental responsibility is needed more today than ever. There is hardly any sector of private life and activity free from governmental intervention. The myriad State agencies and their employees almost defy inventory, to say nothing of control by the people whom they purport to serve. It has not been the policy of the legislature to permit employees of agencies to injure, intentionally or carelessly, private citizens. It is and should be the policy of the State, enforced through its courts, to require boards and agencies to act responsibly, or be subject to answer in court.
In the recent abolition of the doctrine, the Supreme Court of New Mexico, in the case of Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1975), quoted the following holding of the Illinois Supreme Court in Molitor v. Kaneland Community Unit District No. 302, 18 Ill.2d 11, 21-22, 163 N.E.2d 89, 94 (1959):
"It is almost incredible that in this modern age of comparative sociological enlightment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, `the King can do no wrong,' should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs." ... Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign immunity theory, courts have overlooked the fact that the Revolutionary War was fought to abolish that "divine right of Kings" on which the theory is based. (Citations omitted).
The New Mexico Court went on to state:
Accordingly all prior cases wherein governmental immunity from tort liability was recognized are expressly overruled and shall no longer be considered precedents in tort actions filed against governmental agencies.
The Supreme Court of Minnesota, in abolishing the doctrine, stated in the case of Nieting v. Blondell, 306 Minn. 122, 235 N.W.2d 597 (1975):
While we are not compelled to follow the example of other courts, we are persuaded by their logic and adopt their conclusion. One of the paramount interests of the members of an organized and civilized society is that they be afforded protection against harm to their persons, properties, and characters. The logical extension of that interest is that, if harm is wrongfully inflicted upon an individual in such a society, he should have an opportunity to obtain a reasonable and adequate remedy against the wrongdoer, either to undo the harm inflicted or to provide compensation therefor. If the state is properly to serve the public interest, it must strive, through its laws, to achieve the goals of protecting the people and of providing them with adequate remedies for injuries wrongfully inflicted upon them. So long as the state fails to do so, it will be functioning in conflict with the public interest and the public good.
Some court opinions state that the innocent victim should have a right for a wrong *262 done him, and not have to stand the entire burden but that it should be distributed among all people encompassed in the term "state." Although this is a basic legal concept, I reiterate that the "distribution of the wrong among all people" is offset and taken care of fully under modern day insurance business the same as the board of directors and stockholders of any large enterprise. The Supreme Court of Alabama, in Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975), quoted the Supreme Court of the State of Washington and reaffirmed the principle now being announced by state after state that:
It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt ... [municipalities] from liability for their torts, and the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributing among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.
The two most recent states abolishing sovereign immunity are Missouri and Pennsylvania. In the case of Jones v. State Highway Commission, 557 S.W.2d 225 (Supreme Court of Missouri en banc, 1977), said the following:
We hold that sovereign immunity against tort liability is no longer a bar to such actions and reverse and remand for further proceedings.
This is not the first time we have faced the task of evaluating the argument and scholarship over the continued vitality and validity of the doctrine of sovereign immunity. Experience in the last three decades in other states shows wide support as a matter of public policy for a broad area of governmental tort liability, whether accomplished judicially or legislatively... .
Our duty is to respond to the claims which come before us in a manner consistent with the principles embedded in our constitution, statutes, and judicial precedents. This requires, on rare occasions, as it does today, that we reject an earlier rule. We conclude that it is the proper function of the court in applying the principles of a limited constitutional government to reject the rule of sovereign tort immunity and declare that the government shall be liable for its torts, consistent with the proposition that the government is not in the American system, all powerful. This is in accord with the implicit principles manifested in the whole body of our existing positive law. We have thus determined that the dissent of Finch, J., filed in O'Dell v. School District of Independence, 521 S.W.2d 403, 409 (Mo. banc 1975), which thoroughly discusses the doctrine and the view we should now adopt... .
As did Judge Finch, we first address the question of whether the doctrine of sovereign immunity in tort is statutory or decisional, an inquiry crucial to the court's authority to abolish the doctrine under the proper circumstances. Abernathy v. Sisters of St. Mary's, 446 S.W.2d 599 (Mo. banc 1969). We are led to the conclusion that our § 1.010, RSMo 1969, which adopted the common law of England prior to 1607, the fourth year of the reign of James 1, did not adopt the English common law as a substantive statute, but rather as decisional law. Therefore, assuming arguendo that the doctrine of sovereign immunity appeared in English jurisprudence prior to the fourth year of the reign of James 1, we nevertheless have the authority to alter or abrogate the doctrine.
The second issue is, of course, whether the doctrine should be altered or abrogated.
Six reasons offered by English common law and Missouri cases to justify the existence of the doctrine were examined and refuted. The first justification came from the early English cases in which it was said that a suit against a governmental unit such as a town or village was actually a suit against all members of the public, as at that time such governmental units did not have corporate or quasi-corporate existence and *263 were without corporate funds to satisfy judgments. Great inconvenience to the public would result as defendants of means who were required to pay sought contribution from other members of the public. As was pointed out, this argument has lost all forcefulness since today government units have a corporate or quasi-corporate existence and possess corporate funds.
Second, public policy as expressed in the early English cases held that it was better for the injured individual to bear a loss than the public which would then be forced to suffer an inconvenience. This concept was rejected by us in Garnier v. St. Andrew Presbyterian Church, 446 S.W.2d 607 (Mo. banc 1969).
Third, the often quoted maxim that the king can do no wrong has been offered frequently to justify the continued existence of the doctrine. Modern governmental entities cannot, however, lay claim to that inheritance.
The fourth justification declares that public officers are without authority to bind the sovereign without constitutional or statutory authorization. Moreover, the argument continues, any such ability to bind the sovereign would lead inexorably to the wasteful and dishonest dissipation of public funds. We cannot expect that plaintiffs in suits against governmental units will take on any particular personality trait any more so than plaintiffs in other tort actions. Likewise, it cannot be expected that if government is to be subject to suit in tort that government employees will dishonestly dissipate public funds or disburse them in any fashion except in response to court judgments. Additionally we believe that government should both have the benefits of its agents' and employees' acts and the responsibility of them. The doctrine of respondeat superior, in short, should apply to government and its employees.
The fifth justification advanced is the trust fund theory. Its premise is that money which is appropriated to various governmental units is allocated to special purposes for which the funds are held in trust and that to use them to satisfy tort judgments would violate the trust. As we pointed out in Abernathy v. Sisters of St. Mary's, 446 S.W.2d 599, 604 (Mo. banc 1969), which is cited and discussed on O'Dell, supra, the rationale of this theory relates to satisfaction of a judgment, not with whether there is or should be a cause of action. It does not provide a sound basis for maintaining the doctrine of sovereign immunity.
The sixth justification is that without the doctrine, the financial stability of government will be threatened and the proper performance of government functions will be impaired. The response of Judge Finch, with which we agree, was twofold. First, it is a proper purpose of government to stand responsible for its tortious conduct. Second, there is no empirical data demonstrating that the abrogation of the doctrine will substantially impair the financial stability of government to such an extent that there will be interference with the performance of governmental functions. In addition, the prospective application of the doctrine, infra, provides a transition period, giving time for financial planning to accommodate the change. Continuation of the doctrine is not justified on the basis that financial stability of government will be threatened or proper performance of its functions impaired.

.....
Inherent in the governmental-proprietary theory developed by the courts, Judge Finch points out, is the tacit recognition that courts do have the power to modify the doctrine of sovereign immunity, and if there is the power to abrogate in part, there is a right to abrogate completely.
Judge Finch takes the position, with which we agree, that statutes such as § 71.185, RSMo 1969, relating to liability insurance to cover municipal liability for tort claims in connection with governmental functions, § 105.850, RSMo 1969, relating to extension of workmen's compensation coverage to state employees, § 226.092, RSMo 1971 Supp., authorizing liability insurance to cover operation of certain highway commission state-owned automobiles and § 34.275, RSMo 1973 Supp., doing the same as to *264 other state-owned vehicles and vessels, some of which statutes contain disclaimer provisions that they shall not be construed as a waiver of sovereign immunity, do not constitute legislative expressions favoring general retention of sovereign immunity but rather are recognition of the desirability or providing some relief from the present hardships and inequities of the doctrine and do not in any way purport to establish the doctrine in Missouri, citing cases from California, Kansas and Nebraska supporting his view.
In short, we have considered the justifications for the continued validity of the doctrine and find them illogical and unconvincing and not compelled by constitutional mandate.
In the case of Mayle v. Pennsylvania Department of Highways, 479 Pa. 384, 388 A.2d 709 (1978), the Court said the following:
The question before us is whether the Commonwealth is immune from tort liability except where a legislative act expressly or implicitly authorizes suit. This rule of "sovereign immunity" has been recently upheld by this Court. We today abrogate this doctrine of "sovereign immunity." We conclude that the doctrine is unfair and unsuited to the times and that this Court has power to abolish the doctrine.
Whatever justification ever existed for the doctrine that the Commonwealth is immune from liability for tortious conduct unless the Legislature has consented to suit, the doctrine's day has long since passed. Under the doctrine, plaintiff's opportunity for justice depends, irrationally, not upon the nature of his injury or of the act which caused it, but upon the identity or status of the wrongdoer. Three times in recent years we have repudiated as unfair similar status-based immunities of parties. A majority of the states has rejected sovereign immunity at least to some degree, and commentators oppose it nearly unanimously.
.....
If anything, the information before us suggests that making governments liable for their torts will not substantially raise the costs of government or upset governmental financial stability. Certainly, the greatest threats to the financial stability of state and local governments in recent years have not concerned tort liability, but limitations on taxing authority and liability on contractual obligations such as bonds and labor agreements. Further, because negligence involves the reasonableness of the actor's conduct, unreasonably expensive protective measures will not be required of governments any more than they are required of private parties. Welfare economics analysis suggests that government, if suitable in tort, may become more efficient, although this improvement may not appear on its balance sheets as added assets or reduced liabilities.
We recently rejected the government-bankruptcy and flood-of-litigation arguments when we abolished local governmental immunity:
"We must also reject the fear of excessive litigation as a justification for the immunity doctrine. Empirically, there is little support for the concern that the courts will be flooded with litigation if the doctrine is abandoned... . `[M]ore compelling than an academic debate over the apparent or real increases in the amount of litigation, is the fundamental concept of our judicial system that any such increase should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. "It is the business of the law to remedy wrongs that deserve it, even at the expense of a `flood of litigation'; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do." Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich.L.Rev. 874 (1939). We obviously do not accept the "too much work to do" rationale. We place the responsibility exactly where it should be: not in *265 denying relief to those who have been injured, but on the judicial machinery of the Commonwealth to fulfill its obligation to make itself available to litigants.'"
.....
Thus, all the historic arguments made for sovereign immunity either have never been accepted in Pennsylvania or reflect obsolete legal thinking. None has continuing vitality.
This Court has advanced the theory in recent cases that the abolition of the doctrine of governmental immunity is a legislative duty rather than judicial. Berry et al. v. Hinds County, 344 So.2d 146 (Miss. 1977); Rolph v. Board of Trustees of Forrest County General Hospital, 346 So.2d 377 (Miss. 1977).
I certainly have no objection to the legislature making the decision. As hereinbefore stated, it has gone a long way in isolated circumstances and probably would go the entire mile if given sufficient time. I can see easily the obstacles that would be placed in the way of legislators who would seek the complete abolition of the doctrine. It is my opinion, therefore, that this should be a judicial determination. In the first place, the doctrine of immunity was created by judicial edict and therefore the judiciary should be willing to accept the responsibility of correcting its own wrong. As we have seen in reviewing the cases from a majority of the states, it is generally conceded that at this time the doctrine is antiquated and the only question remaining is the manner in which it should be abrogated.
Our sister State of Louisiana, in Board of Commissioners, supra, stated:
Other states in dealing with the problem of the immunity of the state from suit and liability have concluded, as we do, that the origin of the doctrine is judicial, and not constitutional... . In state after state the doctrine of governmental immunity from tort liability is being abrogated by the courts.
The Supreme Court of New Hampshire, in Merrill, supra, said:
A major trend has developed in the last seventeen years toward its [governmental immunity] abolition. During that period governmental immunity has been abolished by judicial decision in at least eighteen States and by legislative enactment in eight others. Finding no supportable rationale upon which this judicially created exception to the ordinary rules of liability can be predicated, it is just and reasonable that a change be made from our previous holdings as to municipal immunity.
The Supreme Court of West Virginia, in the recent case of Long v. City of Weirton, 214 S.E.2d 832 (W. Va. 1975), said:
In an unsophisticated time when demands for governmental services were few and simple of description, perhaps it was correct to say that extinguishing fires, caring for the sick, protecting the citizens in their personal rights and keeping the peace represented the full range of government's mandated responsibilities to its citizens. Perhaps then it was easy to say that any other activity, for example, constructing works of improvement, building roads and streets, supplying water to residences within the municipality and retrieving sewage were completely discretionary with the governmental body. It is obviously not so today.
The Alabama Supreme Court, in the case of Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), said:
We do not overrule old case law lightly or flippantly. But, where precedent can no longer be supported by reason and justice, we perceive it our duty to reexamine, and if need be, overrule court made law.
The Supreme Court of Kansas, in the case of Brown v. Wichita State University, 217 Kan. 279, 540 P.2d 66 (1975), stated:
The doctrine of governmental immunity is an historical anachronism which manifests an inefficient public policy and works injustice upon everyone concerned. The doctrine and the exceptions thereto, operate in such an illogical manner as to *266 result in serious inequality. Liability is the rule for negligent or tortious conduct, immunity is the exception. But when the tortfeasor is a governmental agency, immunized from liability, the injured person must forego his right to redress unless within a specific exception. Equality is not achieved by artificial exceptions which indiscriminately grant some injured persons recourse in the courts and arbitrarily deny such relief to others... . The operative effects of such arbitrary distinctions are incompatible with the constitutional safeguards established by both the federal and Kansas Constitutions.
.....
Nor do we find the threat of multiple lawsuits a tenable basis by which the appellants can be denied access to the courts of this state. The threat of "an infinity of actions" is but a monument of shallow reasoning utilized to thwart necessary changes in the law. No individual can match the state's vast resources. Undoubtedly there will be those who shall seek unnecessarily to avail themselves of the access we now provide. That problem, however, can be resolved either by the demands of the law  demands which must be fulfilled before recover can be secured  or by enactment by the Legislature of an adequate Tort Claims Act. We find it impermissible to deny appellants access to the courts as a means of forestalling, spurious actions.
.....
But if due process is to be secured, the law must operate alike upon all and not subject the few to the arbitrary exercise of governmental power. Every citizen of this state has a right to be protected by the government in the enjoyment of his life, liberty and property. To that end elaborate safeguards are to be found in the law. The life and liberty the state may not take directly, it cannot take indirectly for a "grant of power by the public is never to be interpreted as a privilege to injure."
The Supreme Court of New Mexico quite adequately sums up the reasoning in Hicks, supra, when it said:
The original justification for the doctrine of sovereign immunity was the archaic view that "the sovereign can do no wrong." It is hardly necessary for this court to spend time to refute this feudalistic contention. This and all other rationalizations which have been advanced to justify continued adherence to this doctrine are no longer valid in New Mexico. The argument has been presented that the elimination of sovereign immunity will result in an intolerable financial burden upon the State. We believe it is safe to say that adequate insurance can be secured to eliminate that possible burden in a satisfactory manner. In addition, it would appear that placing the financial burden upon the State, which is able to distribute its losses throughout the populace, is more just and equitable than forcing the individual who is injured to bear the entire burden alone. There are presently in New Mexico no conditions or circumstances which could rationally support the doctrine of sovereign immunity.
... Thus, we take this opportunity to rid the State of this legal anachronism. Common law sovereign immunity may no longer be interposed as a defense by the State, or any of its political subdivisions, in tort actions. Sovereign immunity was born out of the judicial branch of government, and it is the same branch which may dispose of the doctrine. It can no longer be justified by existing circumstances and has long been devoid of any valid justification. In so doing, we join the growing number of States which have judicially abolished it.
I could go on and quote appropriate language from opinions of the highest courts of the other majority of states but it would serve no purpose as they express what has hereinbefore been set out.
As stated at the outset, it has never worried me when persons from other sections of the country have said our state is the last *267 in almost everything. It does worry me, however, if this Court should be the last court in the land to give full protection to each citizen of the State over which we hold the judicial power and the duty resulting therefrom.
With deference to the majority, its opinion impliedly admits that the nonprotection of our people is wrong, but shifts the burden to the legislature. I certainly agree that the legislature should act; however, I can understand why it would be reluctant to do so. That does not relieve this Court of its duty. I believe it is this Court's duty to protect our citizens from wrongs and should act so to do.
PATTERSON, C.J., joins in this dissent.