# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 96-3262

_____

| | | |
|---|---|---|
| Kansas Public Employees Retirement System, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., a law partnership; William H. Sanders, Sr., individually and as the representative of a defendant class, | * | |
| | * | Appeals from the United States |
| | * | District Court for the |
| Defendants - Appellees. | * | Western District of Missouri. |

_____

No. 96-3317

_____

| | |
|---|---|
| Kansas Public Employees Retirement System, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| v. | * |
| | * |
| Reimer & Koger Associates, Inc., a Kansas Corporation; Ronald Reimer, an individual; Kenneth H. Koger, an individual; Clifford W. Shinski, an individual; Brent | * |

Messick, an individual; Robert         *
Crew, an individual; Sherman           *
Dreiseszun, an individual;             *
I. I. Ozar, an individual;             *
Frank Sebree, an individual;           *
Peat, Marwick, Mitchell & Co.,         *
an accountancy firm; KPMG Peat         *
Marwick, an accountancy firm;          *
Robert Spence, an individual;          *
Thomas S. Morgan, co-executor          *
of the estate of Frank S.              *
Morgan; Marilyn J., co-executor        *
of the estate of Frank Morgan,         *
                                       *
        Defendants - Appellees,        *
                                       *
Shook, Hardy & Bacon, through          *
C. Patrick McLarney, acting as         *
a representative of an agreed          *
upon class of partners in              *
Shook, Hardy & Bacon, and for          *
Shook, Hardy & Bacon P.C.,             *
                                       *
        Intervenor Defendant -         *
        Appellee.                      *
                                       *
------------------------------         *
                                       *
Kansas Public Employees                *
Retirement System,                     *
                                       *
        Plaintiff - Appellant,         *
                                       *
        v.                             *
                                       *
Blackwell, Sanders, Matheny,           *
Weary & Lombardi, L.C., a law          *
partnership; William H.                *
Sanders, Sr., individually and         *
as the representative of a             *
defendant class,                       *
                                       *
        Defendants - Appellees.        *

_____

No. 96-3680
_____

| | |
|---|---|
| Kansas Public Employees Retirement System, | * |
| | * |
| | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| v. | * |
| | * |
| Reimer & Koger Associates, Inc., a Kansas Corporation; Ronald Reimer, an individual; Kenneth H. Koger, an individual; Clifford W. Shinski, an individual; Brent Messick, an individual; Robert Crew, an individual; Sherman Dreiseszun, an individual; I. I. Ozar, an individual; Frank Sebree, an individual; Peat, Marwick, Mitchell & Co., an accountancy firm, | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Defendants, | * |
| | * |
| KPMG Peat Marwick, an accountancy firm; Robert Spence, an individual, | * |
| | * |
| | * |
| | * |
| Defendants - Appellees, | * |
| | * |
| Thomas S. Morgan, co-executor of the estate of Frank S. Morgan; Marilyn J., co-executor of the estate of Frank Morgan, | * |
| | * |
| | * |
| | * |
| | * |
| Defendants, | * |
| | * |
| Shook, Hardy & Bacon, through C. Patrick McLarney, acting as a representative of an agreed upon class of partners in Shook, Hardy & Bacon, and for Shook, Hardy & Bacon P.C., | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Intervenor Defendant. | * |

-3-

_____

Submitted:  March 13, 1997

Filed:  May 13, 1997
_____

Before McMILLIAN, JOHN R. GIBSON, and BOWMAN, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

Kansas Public Employees Retirement System, known as KPERS, appeals from the district court's[1] entry of an adverse summary judgment in its case against its investment advisers,[2] accountants,[3] lawyers,[4] one of its own trustees,[5] and the former directors[6] of Home Savings Association, arising out of KPERS's

_____

[1]The Honorable D. Brook Bartlett, Chief Judge, United States District Court for the Western District of Missouri.

[2]The investment advisor defendants are Reimer & Koger Associates, Inc., and a number of individuals associated with Reimer & Koger: Kenneth H. Koger, Ronald Reimer, Clifford W. Shinski, Robert Crew and Brent Messick.

[3]The accountant defendants are KPMG Peat Marwick and Robert W.L. Spence, a partner in Peat Marwick.

[4]The lawyer defendants are Blackwell, Sanders, Matheny, Weary & Lombardi, L.C.; its partner William H. Sanders, Sr.; Shook, Hardy & Bacon, P.C.; and Shook, Hardy & Bacon, a class of partners. A Shook Hardy partner, Frank P. Sebree, is joined both in his capacity as a lawyer and as a Home Savings director.

[5]Michael Russell was a trustee of KPERS and a defendant in this case. The court entered summary judgment for Russell on March 4, 1997, and KPERS appealed. KPERS moved to stay argument of this case so that the appeal could be consolidated with this appeal. We denied that motion. Order of March 11, 1997.

[6]The Home Savings defendants are the Estate of Frank Morgan, Sherman Dreiseszun, I. I. Ozar, and Frank P. Sebree.

-4-

investment in Home Savings, a failed thrift institution.  In an earlier appeal, we held that KPERS's claims were not governed by a ten-year Kansas statute of limitation, but that Missouri choice of law provisions controlled.  KPERS v. Reimer & Koger Assocs., 61 F.3d 608 (8th Cir. 1995)(KPERS III), cert. denied, 116 S. Ct. 915 (1996).  Under the Missouri borrowing statute, KPERS's claims are barred if they would be untimely under the two- and three-year statutes provided by Kansas law. Id.  We remanded to the district court to determine whether KPERS's claims were barred by the Kansas statutes.  The district court held that KPERS's claims are time-barred under Kansas law.[7]  KPERS argues that the court should not have applied the Kansas statutes of limitation to KPERS's claims, because its claims are exempt from all statutes of limitation.  Further, KPERS argues that, even if the claims are subject to the statutes of limitation, the district court erred in applying the statutes of limitation to the facts of this case, specifically that it misconstrued Kansas law concerning when a cause of action accrues, overlooked disputed fact issues, and failed to consider all of KPERS's claims against its accountants.  We affirm the judgments of the district court.

KPERS is the pension fund for certain employees of the state of Kansas.  In 1983 Governor John Carlin began to promote the use of KPERS money to stimulate the Kansas economy.  KPERS's investment consultants, Callan Associates, Inc., advised KPERS in 1983 that investing public pension fund moneys as venture capital to promote regional business would be a high-risk undertaking.  Callan advised

---

[7]KPERS v. Reimer & Koger Assocs., Inc., No. 92-0922-CV-W-9 and No. 95-0819-CV-W-9 (W.D. Mo. June 3, 1996); KPERS v. Reimer & Koger Assocs., Inc., No.92-0922-CV-W-9 (W.D. Mo. July 25, 1996). The court also denied KPERS's motion to amend its Sixth Amended Complaint.  KPERS v. Reimer & Koger Assocs., Inc., No. 92-0922-CV-W-9 (W. D. Mo. Aug. 5, 1996).

KPERS not to embark on such a program, but to stick to "more traditional investments." Carlin appointed a Kansas City businessman, Michael Russell, to KPERS's board of trustees. Russell became chairman of KPERS's board in August 1985. Russell was a friend and business associate of Kansas City banker Frank Morgan.

In 1985, KPERS established a special "Kansas Investment Fund" to make direct investments in Kansas ventures. About the same time, Morgan and his uncle, Sherman Dreiseszun, bought Home Savings, an ailing thrift institution based in Kansas City. As part of the acquisition, Morgan and Dreiseszun entered into an agreement with the Federal Home Loan Bank Board in which they agreed that Home Savings would not engage in transactions with other banks affiliated with Morgan and Dreiseszun. Because Morgan and Dreiseszun were the "standby purchasers" of Home Savings stock, this agreement is known as the "standby purchaser agreement." Russell became a member of the Home Savings board of directors. He and his businesses had borrowed large amounts from Home Savings.

KPERS conducted its investments through outside investment advisors, one of which was Reimer & Koger. Relations between KPERS and Reimer & Koger were governed by a Special Investment Advisory Services Agreement, which incorporated the "prudent man" standard for investing KPERS's money. After Russell became chairman of KPERS's board, Frank Morgan invited Reimer & Koger's principal, Kenneth Koger, to invest $25 million of KPERS's money in Home Savings. Koger only had authority to invest $15 million of KPERS's money without board approval, but on December 31, 1985, Koger committed to invest that amount in Home Savings subordinated debentures. Koger noted in a memo sent to KPERS's executive secretary that Russell was on Home Savings's board and that "something would have to be done about that." Accordingly, Russell

resigned from Home Savings's board on February 12, 1986. Koger then invested KPERS's $15 million in Home Savings subordinated debentures on May 2, 1986. Reimer & Koger retained Blackwell Sanders to do the legal work for this investment. As counsel for Home Savings, Frank Sebree of Shook Hardy issued an opinion of counsel in connection with the investment, stating that to the "best of our knowledge and belief, the Association is not in violation of . . . any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to it."

Morgan next approached Koger about investing $50 million in Home Savings. Because this investment exceeded Koger's investment authority, Koger had to go to the KPERS board for permission to make the investment. On June 6, 1986, Koger wrote a letter to Russell proffering the $50 million investment; Koger's letter stated that the purpose of the investment would be to finance Home Savings's acquisition of a $1 billion St. Louis savings and loan. Russell telephoned the other members of the KPERS board to obtain approval of the investment, and the trustees voted in favor of the investment. In June 1986 Home Savings bid on the St. Louis savings and loan. By the fall of 1986, Home Savings knew it had lost the bid. On September 30, 1986, because the parties were not prepared to close on the debentures, KPERS invested in Home Savings short term promissory notes; the notes were exchanged for subordinate debentures of Home Savings on October 24, 1986. As part of the issuance of the debentures, Sebree again issued an opinion of counsel to KPERS in which he stated that Home Savings was not in violation of any agreement or regulation to his knowledge. However, in actuality, Home Savings had been cited by the bank examiners in its most recent examination for excessive investment in a subsidiary corporation.

On November 13, 1986 the <u>Kansas City Star</u> reported that KPERS had made the $50 million investment in Home Savings. The article quoted Koger as saying that Home Savings had considered buying an unnamed St. Louis savings and loan, but that Home Savings had "pretty much dropped [that acquisition] from consideration."

On December 21, 1986 the <u>Kansas City Star</u> published a lengthy investigative article entitled: "Kansas pension fund ventures raise questions of conflict." The article revealed that Russell had not only been on the Home Savings's board, but that shortly after the $50 million subordinated debenture purchase, one of Russell's businesses had obtained a $40 million loan from another Morgan bank. The article quoted interviews with Koger, Russell, and several other KPERS board members about whether there was a conflict of interest because of Russell's directorship and loans.

As a result of the <u>Kansas City Star</u> article, the Kansas Attorney General, Robert Stephan, undertook an investigation of the possible Russell conflict. Stephan issued a report on March 4, 1987, concluding that Russell had not violated the Kansas ethics law, Kan. Stat. Ann. § 46-233, by virtue of his Home Savings directorship because the amount of money Russell made as a director was below the $2,000 amount specified in the Kansas statute as a "substantial interest," Kan. Stat. Ann. § 46-229, and because Russell had resigned from the directorship by the time of the KPERS investments. Therefore, the Attorney General's report concluded that the Kansas ethics statute did not bar Russell from participating in the making of the Home Savings investment. The Attorney General further considered whether Kansas ethics laws were "appropriate" to protect the fund. The Attorney General determined that KPERS was adequately protected by the requirement that KPERS board members exercise "the judgment and care under the circumstances then prevailing, which men of prudence, discretion

and intelligence exercise in the management of their own affairs."  He stated:  "An attempt to restrict the board any further than this in their investment decisions may prove detrimental to the program."  Further, he noted that "borderline conflict situations" were perhaps an inevitable result of the "desirable" practice of having "successful businessmen" on the board.  Stephan's report did not discuss Russell's loan from the other Morgan bank.

In December 1987 the KPERS $50 million was reinvested in more Home Savings subordinated debentures.  In connection with the reissue, Sebree again issued an opinion stating that Home Savings was not, to his knowledge, in violation of any law, agreement, or regulation.  However, Home Savings's last examination report stated that Home Savings had violated the standby purchasers agreement by buying loans from affiliated banks and had violated federal regulations by excessive investment in a subsidiary.

By May 1988, the bank examiners' criticisms of Home Savings's affiliate transactions, conflicts of interest, and problem loans had become more urgent.  The Kansas City Business Journal reported in September 1988 that Home Savings had been criticized by the examiners in its last examination for affiliate transactions and undercapitalization.  As part of an effort to provide Home Savings with sufficient capital to meet the regulatory requirements, KPERS converted its debentures into preferred stock on March 29, 1990.[8]  In 1991, the regulators closed Home Savings and appointed the RTC as receiver.  KPERS lost its entire $65 million in principal, though it had earlier received some $29 million in interest payments.

---

[8]KPERS agrees that its ultimate recovery following the regulatory takeover was not affected by the conversion of its investment from debt to equity.  Dist. Ct. Order of June 3, 1996 at 36.

Peat Marwick had audited KPERS annually from 1983 to 1988. Because the direct placement investments were difficult to value, KPERS adopted a policy of carrying those investments on its books at cost, minus any permanent impairment. KPERS's investment managers, such as Reimer & Koger, were responsible for reporting to KPERS when they determined an investment was permanently impaired. The investment advisers were compensated according to the amount of money they were handling for KPERS, which meant that they reduced their compensation when they reported an impairment. Peat Marwick warned KPERS in 1987 and 1988 that its direct placement investments were partially impaired and that it needed to establish an investment allowance account to protect it against impairments. Peat Marwick reported to KPERS's in-house accountants in 1987 and 1988 that KPERS had impaired direct placement investments of $10 million and $19 million respectively. Peat Marwick nevertheless issued unqualified opinions despite the impairments. Peat Marwick's successor auditor, Baird, Kurtz & Dobson, recognized in the 1989 audit that KPERS's direct placement losses could be as high as $75 million; in response to this report, KPERS set up an investment allowance account and also wrote down its direct placement investments by $27 million. Reimer & Koger did not write down KPERS's $65 million investment until March 15, 1991, the day Home Savings was placed in receivership.

KPERS initially filed its case on June 5, 1991 in the state courts of Kansas against the Reimer & Koger defendants. On December 23, 1991, KPERS added the Home Savings defendants, the Peat Marwick defendants, and Russell. The Home Savings defendants impleaded the Resolution Trust Corporation, receiver for Home Savings. The RTC had the power under FIRREA, 12 U.S.C. § 1441a(l)(3) (1994), to remove the case to the Western District of Missouri, which it did. KPERS moved to remand the case to the

Kansas court, but the district court denied its motion, and we affirmed in KPERS v. Reimer & Koger Assocs., 4 F.3d 614 (8th Cir. 1993) (KPERS I), cert. denied, 511 U.S. 1126 (1994).

After KPERS advised the two law firms, Blackwell Sanders and Shook Hardy, that it intended to sue them in Kansas, both firms moved to intervene in this case. The court granted Shook Hardy's motion to intervene, but denied permission to Blackwell Sanders. However, we reversed, permitting Blackwell Sanders to intervene as well. KPERS v. Reimer & Koger Assocs., 60 F.3d 1304 (8th Cir. 1995) (KPERS II). KPERS sued Blackwell Sanders in Kansas state court on January 6, 1995. Blackwell impleaded the RTC, which removed the case to the Western District of Missouri.

KPERS's complaint (by now, its Sixth Amended Complaint) is pleaded in fifteen counts and asserts a variety of theories, including common law fraud, statutory securities fraud, various breaches of fiduciary and professional duties, negligence, breach of contract, and civil conspiracy. There are a few crucial factual allegations relevant to most of the different legal theories. First, KPERS alleges that the Home Savings defendants and Reimer & Koger misrepresented that Home Savings would use KPERS's $50 million investment to buy a $1 billion St. Louis savings and loan. KPERS alleges that Home Savings actually knew when it received the $50 million that it would not use the money to buy the St. Louis savings and loan, because Home Savings needed the money to raise its capital level to the regulatory minimum. KPERS alleges Reimer & Koger knew the money would not be so used, but failed to tell KPERS. KPERS alleges that Russell told the other KPERS trustees that the money would be used to buy the St. Louis savings and loan. Second, KPERS alleges that Sebree issued opinion letters on behalf of Home Savings saying that Home Savings was not in violation of any governmental regulation or agreement, when in fact Home Savings

-11-

was in violation of the standby purchaser agreement it had entered with the Federal Home Loan Bank Board and had excessive investments in one of its subsidiaries.  Third, KPERS alleges that the Home Savings defendants made several statements about the quantum of risk in their lending portfolio, and that these statements were false because the credit risk was much higher due to high risk transactions done to benefit other Morgan banks. Similarly, KPERS claims Reimer & Koger and Blackwell Sanders failed to advise KPERS of the high-risk nature of the Home Savings investment. Fourth, KPERS alleges that Russell made false statements to the other KPERS trustees in order to procure KPERS's money for Home Savings so that Home Savings's affiliates would, in turn, lend him $40 million.  KPERS claims that the Home Savings defendants, Shook Hardy, Blackwell Sanders and Reimer & Koger participated in Russell's breach of duty by failing to reveal Russell's conflicts of interest to KPERS.  Finally, KPERS alleges the Peat Marwick defendants' failure to identify and write off impaired investments caused KPERS to overvalue its investment in Home Savings and prevented it from discovering the wrongdoing of other defendants and from taking action to stop its losses.

The Home Savings defendants moved for summary judgment on the grounds that KPERS's claims were time-barred.  The district court determined that Kansas choice of law rules should govern the choice of limitations law and that the applicable Kansas period was provided by a ten-year statute enacted especially to govern civil actions brought by KPERS, Kan. Stat. Ann. § 60-522 (1994).  In an interlocutory appeal, we reversed, holding that Missouri choice-of- law rules governed, and that the ten-year Kansas statute did not purport to revive barred claims.  KPERS III, 61 F.3d at 615.  In KPERS III we held that "the Missouri borrowing statute requires the district court to apply the Kansas two- and three-year statutes [Kan. Stat. Ann. §§ 60-513(a) and 60-512] to KPERS' claims if the

-12-

claims would be 'fully barred' by these statutes (a finding of fact which has not been made)."[9]  Id.  We remanded for the district court to determine whether KPERS's claims were barred by these statutes.  Id.

On remand, all the defendants moved for summary judgment on the grounds that KPERS's claims were barred by the Kansas two-year tort statute, Kan. Stat. Ann. § 60-513(a) (1996 Cum. Supp.), and the Kansas three-year statute for statutory claims, Kan. Stat. Ann. § 60-512 (1994). The district court held that the defendants were entitled to summary judgment on the ground that KPERS's claims were time-barred.  Orders of June 3, 1996 (Home Savings defendants, law firm defendants, and Reimer & Koger defendants), July 25, 1996 (Peat Marwick defendants); and March 4, 1997 (Russell).  The court also denied KPERS's motion to amend its Sixth Amended Complaint to add a breach of contract claim against the Peat Marwick defendants.  Order of August 5, 1996.

The district court first considered the summary judgment motion of the Reimer & Koger defendants.  The court concluded that, even though KPERS pleaded one of its claims as a breach of the Special Investment Advisory Services contract, the Kansas two-year tort statute would apply to all KPERS's claims against Reimer & Koger, because KPERS's contract did not call for a specific result, but simply required discharge of duties imposed by law by virtue of

_____

[9]KPERS has also appeared before us in matters arising out of the same underlying case, but not directly relevant to the issues here.  In KPERS v. Reimer & Koger Assocs., 77 F.3d 1063 (8th Cir.) (KPERS IV), cert. denied, 117 S. Ct. 359 (1996), we affirmed a district court order enjoining KPERS from prosecuting suits in Kansas state court based on the same claims being litigated in this case.  In In re KPERS, 85 F.3d 1353 (8th Cir. 1996) (KPERS V), we denied KPERS's petition for writ of mandamus directing the district judge to recuse himself.

the contract.  Order of June 3, 1996, slip op. at 43-45 (citing <u>Hunt v. KMG Main Hurdman</u>, 839 P.2d 45, 47 (Kan. Ct. App. 1992)).

Therefore, the court held that KPERS's claims against the  Reimer & Koger defendants would be barred if they had accrued before June 5, 1989, two years before KPERS filed suit against the Reimer & Koger defendants. <u>Id.</u> at 45.  Under Kansas law, the statute of limitation would begin to run at the time it was reasonably ascertainable that the plaintiff had suffered an injury caused by the defendant's wrongdoing.  <u>Id.</u>  at 46 (citing <u>Dearborn Animal Clinic, P.A. v. Wilson</u>, 806 P.2d 997 (Kan. 1991)).  The court held that the evidence showed the KPERS board of trustees had actual knowledge before June 5, 1989, of the facts KPERS now alleges Reimer & Koger failed to tell KPERS about:  that Home Savings was no longer planning to use KPERS's $50 million to buy the St. Louis savings and loan; that Russell was a director of Home Savings and borrowed money from another Morgan bank; and that Home Savings was engaged in risky real estate and commercial lending.  <u>Id.</u> at 47-48, 52.

Alternatively, the court held that even if the KPERS board did not have actual knowledge about these things, Reimer & Koger's knowledge could be imputed to KPERS because Reimer & Koger was  KPERS's agent and an agent's knowledge can be imputed to its principal.  <u>Id.</u>  at 49-50.

The  court also rejected KPERS's argument that Reimer  & Koger concealed the facts from KPERS and therefore the statute should be tolled. The court held that no reasonable finder of fact could conclude that Reimer & Koger intentionally concealed information from KPERS.  <u>Id.</u>  at 54.

The court held that the same knowledge that caused KPERS's claims against Reimer & Koger to accrue before June 5, 1989 would also bar its common law tort claims against the Home Savings defendants, which were filed several months later than the claims against the Reimer & Koger defendants. Id. at 60. KPERS also sued the Home Savings defendants for statutory securities fraud, which has a three-year statute of limitation, Kan. Stat. Ann. § 60-512; see Kelly v. Primeline Advisory, Inc., 889 P.2d 130, 134 (Kan. 1995). The court held that KPERS had knowledge of the key facts by December 23, 1988, which meant that its statutory claims against the Home Savings defendants were also barred. Order of June 3, 1996, slip op. at 61.

The claims against Shook Hardy and Blackwell Sanders were even more obviously barred, since Shook Hardy did not move to intervene until October 14, 1994, id. at 64, and KPERS did not sue Blackwell Sanders until January 6, 1995, id. at 67. The same facts relevant to the claims against the other defendants barred KPERS's suits against these two law firms long before the suits were brought. Id. at 64-65, 69.

In a separate order, the court held that the claims against the Peat Marwick defendants were barred by the two-year statute of limitation. KPERS claims Peat Marwick misled it by signing off on audits of KPERS without advising KPERS that its Home Savings investments were impaired or that it should establish an investment allowance account. The court pointed to a number of facts that would cause the statute to begin running before December 23, 1989, including the fact that Peat Marwick stated in its 1987 and 1988 auditor's reports that some of KPERS's direct placement investments were impaired and recommended that KPERS establish an investment allowance account. Order of July 25, 1996, slip op. at 21. Moreover, by September 30, 1989, after an audit by a new auditor,

-15-

Baird, Kurtz & Dobson, KPERS established an investment allowance account and wrote off a portion of its direct placement investments.  Id. at 22.

## I.

KPERS makes threshold legal arguments that its claims are not subject to any statute of limitation.

We review a grant of summary judgment de novo.  See Uhl v. Swanstrom, 79 F.3d 751, 754 (8th Cir. 1996).  Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  We also review de novo the district court's determination of questions of state law.  See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).

In KPERS III we held that Missouri limitations law governed this case and that under Missouri's borrowing statute the Kansas two- and three-year statutes of limitation applied to KPERS's claims if those statutes fully barred the claims.  61 F.3d at 614-16.  The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings.  See Little Earth of the United Tribes, Inc. v. United States Dep't of Hous. & Urban Dev., 807 F.2d 1433, 1441 (8th Cir. 1986).  The law of the case doctrine applies to issues decided implicitly as well as those decided explicitly.  Id. at 1438.  We are satisfied that the law of the case doctrine prevents KPERS from relitigating the issue of whether these statutes apply to its claims.  See United States v. Duchi, 944 F.2d 391, 392-93 (8th Cir. 1991).  We recognize that the law of the case

-16-

doctrine does not apply when it results in a manifest injustice, and therefore we briefly discuss the merits of KPERS's arguments for exemption from the statutes of limitation.

**A.**

KPERS argues that its investment in Home Savings was a governmental function, and therefore, its claims arising out of that investment are not subject to any statute of limitation.

The Kansas Supreme Court has stated that "[m]aintaining KPERS is a proprietary function of the state." In re Midland Indus., 703 P.2d 840, 843 (Kan. 1985) (discussing the holding of Shapiro v. KPERS, 532 P.2d 1081 (Kan. 1975)). In Shapiro, the Kansas Supreme Court rejected the argument that sovereign immunity barred payment of interest on a claim for benefits made by an employee's widow. Shapiro, 532 P.2d at 1085. Shapiro looked to the statutes creating KPERS as a body corporate with the power to sue and be sued, and held that if a government enters into business ordinarily reserved to the field of private enterprise, it should be held to the same responsibilities and liabilities. Id. at 1083-84. A member of KPERS or his beneficiary should be provided the same protection and the same redress as if the breach of contract had been committed by a private insurance company. Id. at 1084-85. While the issue in Shapiro involved a claim for benefits only, Midland's explanation of the holding in Shapiro demonstrates the broad scope of the ruling. These clear holdings compel rejection of KPERS's argument.[10]

---

[10]KPERS argues that the Missouri common law doctrine of nullum tempus occurrit regi bars all statutes from running against a claim by the state. The Kansas Supreme Court has held in State Highway Commission v. Steele, 528 P.2d 1242, 1243-44 (Kan. 1974), that enactment of section 60-521, Kan. Stat. Ann. § 60-521 (1994), abolishes this doctrine where public bodies are operating in a proprietary capacity. Further, the doctrine has been applied by most states only to actions brought by a state in its own courts. See, e.g., Pennhurst State Sch. v. Estate of Goodhartz, 200 A.2d 112, 116 (N.J. 1964).

-17-

Indeed, the Kansas legislature in enacting section 60-522, Kan. Stat. Ann. § 60-522 (1994), which we discussed at length in KPERS III, has acknowledged that statutes of limitation run as to claims asserted by KPERS.

KPERS has made extended arguments that its operations are governmental functions as opposed to proprietary. The Kansas Supreme Court has made clear that an activity is a proprietary function if it is commercial in character, usually carried on by private parties, or conducted for profit. See Carroll v. Kittle, 457 P.2d 21, 28 (Kan. 1969); State ex rel. Schneider v. McAfee, 578 P.2d 281, 283 (Kan. Ct. App. 1978). KPERS's actions arising from its investment activities meet this description fully, and do not differ from the suit for contractual benefits involved in Shapiro.

Similarly, KPERS argues that the investments are governmental because the profits reduce the burden on Kansas taxpayers to fund KPERS, the funds were invested to stimulate the Kansas economy, and Kansas statutes require the funds to be invested. Insofar as these arguments are not answered by those cases we have cited above, the Kansas Supreme Court's decisions in Wendler v. City of Great Bend, 316 P.2d 265, 269, 274 (Kan. 1957), and Grover v. City of Manhattan, 424 P.2d 256, 259 (Kan. 1967), compel rejection of KPERS's arguments.[11]  This analysis also forecloses KPERS's argument

---

[11]KPERS argues that we should certify to the Kansas Supreme Court several issues presented in its appeal, including the issue of governmental immunity. In KPERS III we decided that the Missouri borrowing statute required the application of the Kansas two- and three-year statutes of limitation. 61 F.3d at 615. KPERS's petitions for rehearing en banc and for certiorari were denied. Our ruling in KPERS III is the law of the case, and we reject the suggestion that these issues be certified to another tribunal.

that its claims against Peat Marwick arise out of governmental functions.

## B.

KPERS argues that its claims are not subject to a statute of limitation because they are actions to recover from a former officer or employee for his breach of duty. See Kan. Stat. Ann. § 60-521 (1994). KPERS did not raise this argument in the district court. KPERS contends that this failure is excused because it raised this argument in the state trial court before this case was removed to the district court.

We have often stated that we will not consider arguments that were not presented first to the district court. See Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994). If KPERS intended to rely on its breach-of-duty argument, it should have presented that argument to the district court in opposition to the defendants' motions for summary judgment. We refuse to consider KPERS's breach-of-duty argument.

## C.

KPERS also argues that the state trial court held that KPERS's claims were not subject to a statute of limitation because the defendants participated in a former officer's breach of duty and that the district court could not ignore the state court's holding. Again, KPERS did not present this argument to the district court,

and we reject KPERS's attempt to raise this argument for the first time before this court.  See id.

## II.

KPERS argues that the district court erred in its conclusion that KPERS had sufficient knowledge to start the statute of limitation running on its claims before December 23, 1988.

KPERS argues that the facts do not show it had knowledge by December 1986 that Home Savings was no longer seeking to acquire the St. Louis savings and loan that Koger advised it about in his June 6, 1986 letter to Russell proffering the opportunity to invest $50 million in Home Savings. First, KPERS contends that the statements the district court cited were only statements that Home Savings would probably not buy the St. Louis savings and loan, and that statements of probability are not enough to start the statute of limitation running.  (KPERS does not deny that it had knowledge of the statements that the acquisition was unlikely).  To the contrary, Kansas law does not require that the plaintiff have ironclad actual knowledge about his injury, but rather that he have such notice as would permit him to discover the injury with the use of due diligence. "'Reasonably ascertainable' does not mean 'actual knowledge.'"  Davidson v. Denning, 914 P.2d 936, 948 (Kan. 1996).  Accord Miller v. Foulston, Siefkin, Powers & Eberhardt, 790 P.2d 404, 417 (Kan. 1990); Brueck v. Krings, 638 P.2d 904, 908 (Kan. 1982); Kelley v. Barnett, 932 P.2d 471, 476-77 (Kan. Ct. App. 1997).  The public statements that the St. Louis acquisition was unlikely were enough to put KPERS on notice that its money might not be used to buy the St. Louis thrift.

KPERS contends that there is an issue of fact about whether it learned before 1990 that the St. Louis acquisition did not go through. KPERS points to a memo from outside counsel in Reimer & Koger's files asking: "Was it ever explained to KPERS that [Home Savings] did not buy a big St. Louis association?" Next to this question is the handwritten response, "No." Even if we took this memo as evidence that Reimer & Koger did not tell KPERS the St. Louis deal did not happen, there is still no question but that KPERS was on inquiry notice from other sources cited by the district court, including the November 13, 1986 article in the Kansas City Star which stated that Home Savings had "pretty much dropped" the St. Louis deal from consideration. See Brueck, 638 P.2d at 908 (fact of injury reasonably ascertainable from press reports); see also Davidson, 914 P.2d at 947 (plaintiff charged with knowledge of coroner's report). The fact that KPERS enjoyed a fiduciary relation with Reimer & Koger does not relieve KPERS of the obligation to exercise due diligence. See Miller, 790 P.2d at 417.

KPERS contends that the district court erred in imputing to KPERS Reimer & Koger's knowledge of the abandonment of the St. Louis deal. It is not necessary for us to decide whether Reimer & Koger could benefit from the imputation of its knowledge to KPERS. Cf. Wietharn v. Safeway Stores, Inc., 820 P.2d 719, 722-23 (Kan. Ct. App. 1991). The district court only mentioned imputing Reimer & Koger's knowledge to KPERS as an alternative ground, there being other evidence, both press reports and statements that were actually communicated to KPERS, that established notice independently. Order of June 3, 1996, slip op. at 48. For instance, KPERS's executive secretary received a copy of an internal Reimer & Koger memorandum from October 1986 saying the St. Louis deal was "probably dead." Moreover, after Home Savings had failed in its bid for the St. Louis thrift, Reimer & Koger issued

letters of intent to KPERS stating that the money would be used by Home Savings for "general corporate purposes."  But most telling, the Kansas City Star article of November 13, 1986 highlighted the discrepancy between the original plan to use the $50 million to buy a St. Louis thrift and the current situation in which the St. Louis deal had likely been abandoned and the parties had not announced specific plans for what to do with the money. Thus, there is no need to impute Reimer & Koger's knowledge to KPERS to conclude that the limitations periods necessarily expired before KPERS filed its claims.

KPERS also argues that even knowledge that Home Savings did not buy the St. Louis savings and loan would not have started the statute running, since this would not have shown wrongdoing by Home Savings.  This argument is difficult to reconcile with KPERS's complaint, since KPERS pleaded as one instance of fraud that the Home Savings defendants represented they would use the $50 million to acquire the St. Louis savings and loan, whereas the defendants knew when they received the money that they would not so use it.  If KPERS now contends that the untruth it alleged is "no wrongdoing," we can only conclude that KPERS has abandoned this theory of fraud, making any discussion of the statutes of limitation moot.  This argument certainly does not lead to reversal of the district court's entry of summary judgment.

KPERS also argues that the district court relied on knowledge imputed from Reimer & Koger to conclude that KPERS knew of Home Savings's involvement in risky lending for the benefit of its affiliate banks and its violation of the standby purchasers agreement and other banking regulations.  Again, any such imputation was superfluous, there being sufficient proof that

knowledge of these facts was public information well within the relevant period.[12]

The existence of regulatory problems and unusual credit risk was made explicit and public by the Kansas City Business Journal article of September 12, 1988, which reported severe criticisms of Home Savings by federal savings and loan regulators. The article stated:

> [A] letter sent 11 weeks ago to Home Savings by federal savings and loan regulators told the thrift to sever its relationships with other Morgan-group banks because they violated savings and loan regulations and contravened an agreement Morgan and Dreiseszun entered into when they acquired [Home Savings] in 1985. . . . The letter, which was sent by the Federal Home Loan Bank of Des Moines, Iowa, on June 20, also criticized loan underwriting procedures at the thrift, expressed concern about its low level of capital under generally accepted accounting principles (GAAP) and strongly recommended that it employ a compliance officer.

Such public knowledge is sufficient under Kansas law to put KPERS on notice that it had been injured. See Brueck, 638 P.2d at 908. If the two-year tort statute began to run when this article was published on September 12, 1988,[13] it expired before June 5, 1991,

---

[12]KPERS also states that the district court relied on Koger's testimony about conversations with KPERS's executive secretary that the executive secretary denied. The "denial" KPERS cites is simply: "I have no recollection of being informed that [Home Savings] was in violation of contract or federal regulations concerning affiliated transactions, and I have no reason to believe I ever received such information." But since other, undisputed evidence exists which is sufficient to support the summary judgment, we need not decide if the secretary's lack of recollection would be sufficient to create a material issue of fact as to whether the conversations Koger testified about took place.

[13]The district court pointed to many other instances of notice before the Kansas City Business Journal article. Because the article is sufficient to establish notice, we have no need to discuss the other evidence.

when KPERS sued the Reimer & Koger defendants. The three-year statute applicable to the securities fraud claims against the Home Savings defendants would then have expired before December 23, 1991, when KPERS sued those defendants.

As for the alleged failure to reveal Russell's relationship with Home Savings, KPERS contends that the statute did not begin to run when it discovered the facts that Russell had been a Home Savings director and that he had obtained a $40 million loan from a Morgan bank shortly after the KPERS investment in Home Savings. KPERS says that it exercised due diligence after learning of these facts, since the Kansas Attorney General Robert Stephan investigated the issue and concluded that Russell had not transgressed Kansas ethics laws. Therefore, KPERS says, under Dearborn Animal Clinic, P.A. v. Wilson, 806 P.2d 997, 1006 (Kan. 1991), and Gilger v. Lee Construction, Inc., 820 P.2d 390 (Kan. 1991), its injury was not "reasonably ascertainable" until a 1991 Kansas legislative investigation indicated that the loans to Russell were not arms' length transactions, but were made after Russell's previous loans were in trouble.

In Dearborn Animal Clinic and Gilger, the plaintiffs relied on representations by the defendant or by third parties that put them off the trail of the alleged tort. Dearborn Animal Clinic was a malpractice action against a lawyer who was asked to draft a contract to sell stock, but instead drafted an option contract that did not obligate the buyer to purchase the stock. When the buyer refused to go through with the sale, the sellers retained a new lawyer, who filed suit to enforce the agreement on the theory that it required the purchaser to buy the stock. 806 P.2d at 1006. The

Kansas Supreme Court stated that the statute did not begin to run when the purchaser refused to go through with the sale, since the sellers were entitled to rely on the expertise of their new lawyer, who was still attempting to enforce their original understanding of the agreement. However, the record made clear that by the time the sellers answered interrogatories in their case against the buyer, they knew their contract did not actually require the purchaser to buy their stock. Id. at 1007. At that time, the statute began to run. Id. In Gilger, the plaintiffs were poisoned by carbon monoxide from an improperly vented furnace. One of the plaintiffs consulted doctors who misdiagnosed her problems. Gilger v. Lee Constr., Inc., 798 P.2d 495, 497 (Kan. Ct. App. 1990). She also contacted two of the defendants, who told her the furnace was working properly. 820 P.2d at 393. Finally, the plaintiffs sought another opinion and were informed that their furnace was improperly vented. 798 P.2d at 502. The Kansas Court of Appeals held that there was a question of fact as to whether the statute began to run before the plaintiffs received the opinion that the furnace was improperly vented. The Kansas Supreme Court affirmed in relevant part. 820 P.2d at 400-01.

In contrast to Dearborn and Gilger, the plaintiff in this case claims that it was entitled to rely on its own investigation that failed to uncover facts that were actually public knowledge. Throughout this litigation, KPERS has stressed its identity with the state of Kansas. KPERS claims it relied on the report of the Attorney General of Kansas, who is not a defendant or a third party, but who acts for the state of Kansas. The Kansas Attorney General did not discuss Russell's loans in his report. KPERS does not dispute the fact that the existence of those loans was laid bare for the readership of the Kansas City Star. In fact, the Star article quotes the Attorney General as saying he would undertake an investigation as a result of the Star story. The Attorney

General's report concluded that Russell's former position as Home Savings director did not violate existing Kansas statutes, and that the existing laws were sufficient to address the "most egregious" conflicts. The Attorney General stressed the importance of having "successful businessmen" on the KPERS board and concluded that some "borderline" situations might be an inevitable concomitant of having such board members. Whatever the reason for the Attorney General's failure to discuss the loans, a plaintiff's choice not to follow up on information in his possession cannot benefit the plaintiff and disadvantage the defendants. Gilger and Dearborn require a plaintiff to exercise due diligence. KPERS cannot use the Kansas Attorney General's report to toll the statute against the defendants.

KPERS also argues that the district court erred in saying that the statute of limitation began to run before December 1 and December 8, 1987, when the $15 million and $35 million components of the $50 million investment finally closed. The district court held that the statute began to run in December 1986, see, e.g., Order of June 3, 1996, slip op. at 51; whereas, the $50 million was actually invested and reinvested several times, with the last issues of subordinated debentures occurring on December 1 and 7, 1987. However, the fact that KPERS may have chosen to reinvest the money after becoming aware of the facts it says were initially hidden from it does not change the result here. If KPERS contends that it invested its money after it knew or should have known of the relevant facts, then it concedes away the reliance element of its fraud claims. This argument may moot the statute of limitation question, but it does not affect the propriety of the district court's grant of summary judgment against KPERS. In any case, even if the statute began to run on the date of the last investment, December 7, 1987, the relevant two- and three-year periods still

expired before KPERS filed suit.  Therefore, this argument does not help KPERS.

KPERS argues that the Reimer & Koger defendants' breaches of duty continued into 1990, when Reimer & Koger allegedly concealed facts about Home Savings's financial condition in order to induce KPERS to trade its subordinated debentures for preferred stock.  If this argument is meant to establish a tort based on KPERS's conversion from debt to equity, KPERS has made concessions fatal to its claim.  The district court recited: "KPERS agrees that its 'ultimate recovery following the OTS takeover was in no way different due to the conversion from debt to equity which occurred in March of 1990.'"  Order of June 3, 1996, slip op. at 36.

KPERS contends that the district court improperly constricted KPERS's claims against the Peat Marwick defendants to:  failing to tell KPERS its Home Savings investment was impaired; and failing to tell it to establish an investment allowance account.  KPERS says that this ignores its allegations that Peat Marwick was the auditor for Home Savings.  KPERS alleges Peat Marwick did not reveal a conflict of interest so profound that it should have disqualified Peat Marwick from auditing Home Savings, because, among other things, the managing partner of Peat Marwick's local office was deeply indebted to Home Savings and other Morgan banks and was in financial distress.  These allegations do not constitute a separate cause of action, but are only an elaboration on the basic contention that Peat Marwick failed to alert KPERS to its losses on the Home Savings investment, which kept KPERS from discovering the other defendants' breaches of duty and from acting to stop its losses.  The district court held that KPERS was put on notice that the 1987 and 1988 financials did not reflect the true value of the direct placement investments and that this notice occurred at least by the date of the successor auditor's report (September 30, 1989)

showing as much as $75 million in impaired investments. Order of July 25, 1996, slip op. at 22. Pointing to additional facts KPERS claims it did not know cannot relieve KPERS of the consequences of what it clearly did know. KPERS contends that the successor auditor's finding that the direct placement investments were impaired did not include a specific finding that the Home Savings investment was impaired. Again, Kansas law does not require that the plaintiff have particularized knowledge of the facts of the negligence, but rather that the plaintiff respond to such notice as would cause a reasonably diligent person to investigate. See Kelley v. Barnett, 932 P.2d at 477. After learning there was a problem with the valuation of its direct placement investments, KPERS was not entitled to sit idly by waiting for Peat Marwick to cite chapter and verse.

### III.

KPERS also argues that the district court erred in denying it permission to amend its Sixth Amended Complaint to state a claim against the Peat Marwick defendants for breach of contract. The district court set February 1, 1995, as a deadline to amend pleadings, and KPERS filed this motion on November 15, 1995. Denying an eleventh-hour request to amend a Sixth Amended Complaint after the deadline for such amendments has passed is a decision well within the district court's discretion. See Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 224 (8th Cir. 1994). We will not reverse on this ground. In any event, KPERS's argument that its claims against Reimer & Koger and Peat Marwick could sound in contract is contrary to Kansas law, since KPERS does not allege breach of a contract to achieve a specific result. See KPERS v. Reimer & Koger Assocs., No. 75,487, 1997 WL 186988, at *3 (Kan.

-28-

April 18, 1997); Hunt v. KMG Main Hurdman, 839 P.2d 45, 48 (Kan. Ct. App. 1992).

## IV.

To preserve its position for further proceedings, KPERS renews its argument that we erred in affirming the injunction in KPERS IV, 77 F.3d at 1065. KPERS acknowledges that the KPERS IV decision is law of the case; therefore, we need not discuss this argument.

We affirm the orders of the district court.

A true copy.

    Attest:


       CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.